## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

LIBRE BY NEXUS,     )
           )
and         )
           ) Case No. _____
ANDRES BARRENO,    )
           )
   Plaintiffs,    )
           )
v.          )
           )
SHERIFF GRADY JUDD, in his official )
capacity as Sheriff of Polk County,  ) JURY TRIAL DEMANDED
Florida, and in his individual capacity, )
           )
and         )
           )
POLK COUNTY SHERRIFF'S OFFICE, )
           )
   Defendants.    )

## COMPLAINT

Plaintiffs, through their undersigned attorney, file this Complaint against

Defendants, SHERIFF GRADY JUDD, in his official capacity as Sheriff of Polk

County, Florida, a/k/a POLK COUNTY SHERRIFF'S OFFICE and in his

individual capacity, all of whom have misused emergency shelters as unlawful

pedestrian checkpoints to conduct suspicion-less warrant/criminal background

checks on human beings desperate for shelter to save their lives in the face of the

worst hurricane in modern times. Plaintiffs use 42 U.S.C. § 1983 as the vehicle to

vindicate the constitutional right to be free from unreasonable searches and

seizures at an unlawful pedestrian checkpoint. In support of this Complaint,

Plaintiffs allege:

## <u>INTRODUCTION</u>

1.

During a crisis situation in which thousands of Florida residents sought

shelter from the worst hurricane in modern times, Sheriff Grady Judd decided to

misuse all emergency shelters in his jurisdiction as pedestrian checkpoints to

detect ordinary criminal wrongdoing. He boasted on Twitter: "If you have a

warrant, turn yourself in to the jail—it's a secure shelter," and, "If you go to a

shelter for Irma and you have a warrant, we'll gladly escort you to a safe and

secure shelter called Polk County Jail." His spokesperson added, "We hope it

[people seeking emergency shelter] actually leads to more people turning

themselves in." Indeed, Judd— the individual who sets policy for Polk County—

has made it quite clear that he and his subordinate officers/deputies are simply

trying to "detect evidence of ordinary criminal wrong doing," at the entrance

doors of shelters being used to save human lives. *See City of Indianapolis v.*

*Edmond*, 531 U.S. 32, 37-48 (2000). All statements to the contrary made by Judd

are belied by the facts, and the law.

2.

Judd's statement that his conduct is aimed toward sexual predators is nothing more than a guise for undertaking unconstitutional searches and seizures. First, the state of Florida requires each person who has been designated a sexual predator/offender who has a driver's license/identification card to have on that card—in big bold letters—that said person is a sexual predator/offender:

> It is unlawful for any person designated as a sexual predator or sexual offender to have in his or her possession a driver license or identification card upon which the sexual predator or sexual offender markings required by s. 322.141 [Color or markings of certain licenses or identification cards] are not displayed or have been altered.

§ 322.212(5)(c), Fla. Stat.

3.

Florida law further ensures that the licenses and identification cards of sexual predators/offenders contain clear markings, by mandating the following:

> (3)     All licenses for the operation of motor vehicles or identification cards originally issued or reissued by the department to persons who are designated as sexual predators under s. 775.21 or subject to registration as sexual offenders under s. 943.0435 or s. 944.607, or who have a similar designation or are subject to a similar registration under the laws of another jurisdiction, shall have on the front of the license or identification card the following:

> (a)     For a person designated as a sexual predator under s. 775.21 [The Florida Sexual Predator Act] or who has a similar designation under the laws of another jurisdiction, the marking "SEXUAL PREDATOR."

3

(b)    For a person subject to registration as a sexual offender under s. 943.0435 [Sexual offenders required to register with the department; penalty] or s. 944.607 [Notification to Department of Law Enforcement of information on sexual offenders], or subject to a similar registration under the laws of another jurisdiction, the marking "943.0435, F.S."

(4)    Unless previously secured or updated, each sexual offender and sexual predator shall report to the department during the month of his or her reregistration as required under s. 775.21(8), s. 943.0435(14), or s. 944.607(13) in order to obtain an updated or renewed driver license or identification card as required by subsection (3).

§ 322.141, Fla. Stat.

All the above means that Sheriff Judd does not have to run a warrant check or criminal background check to determine if someone is a sexual predator/offender because all he has to do is check each person's license/ID card and deal accordingly with those persons designated as sexual predators/offenders.

4.

Sheriff Judd's true motives are clear and have been expressed by him explicitly: The purpose of these pedestrian "checkpoints" is to conduct a fishing expedition to find any possible basis, no matter how tenuous, for issuing citations to or arresting human beings seeking refuge from a Category 5 hurricane. The problem is that these searches and seizure are not based on any suspicion of criminal conduct. Suspicion is not raised by trying to gain entry into an emergency shelter to save one's life and the lives of family members.

5.

Judd's policy is classic protectionism against "outsiders" entering his county, and he uses the greatest natural disaster in modern times to execute it.

**PARTIES**

6.

At all times relevant to this Complaint, Mr. Barreno was a citizen of the United States and a resident of Virginia. Mr. Barreno, at all times relevant to this Complaint, had clearly established legal rights under state and federal law and the U.S. Constitution. Mr. Barreno submits himself to the jurisdiction and venue of this Court and is entitled to bring this action under state and federal law for all general, special, compensatory, punitive, and any other permissible damages.

7.

At all times relevant, Libre by Nexus has been a for profit corporation that has, as one of its missions, the stabilization of court appearances for immigrants facing deportation and having active cases before the Executive Office of Immigration Review (EOIR) courts. Through its secure GPS and monitoring/support program, Libre by Nexus has increased court appearance by immigrants in removal proceedings (and released from detention centers) from an estimated 35% to nearly 99% appearance rate and has secured the release of

over 15,000 immigrants from federal custody so that they can be home with their families, saving US taxpayers in excess of $600,000,000. Libre by Nexus clients receive support and services from the organization.  Libre by Nexus has multiple clients with bonds in the state of Florida, representing millions of dollars in bonds.

8.

At all times relevant to this Complaint, Defendant Judd was a United States citizen, a Florida resident, and the sworn Sheriff of the Polk County Sheriff's Office. At all relevant times to this Complaint, Defendant Judd was acting under the color of state law. At all relevant times, Defendant Judd was subject to the laws of the Florida and the Constitution of the United States. At all relevant times, Judd was responsible for knowing and acting in accordance with all policies, procedures, orders, special orders, general orders, guidelines and regulations of the Polk County Sheriff's Office. And at all relevant times, Judd was the policy maker—on behalf of Polk County Sheriff's Office —for all matters related to warrant checks and criminal background checks conducted by Judd and law enforcement officers under his command and control. Mr. Barreno is using 42 U.S.C § 1983 as the vehicle to sue the Polk County Sherriff's Officer and Defendant Judd in his individual and official capacities regarding federal claims.

## JURISDICTION AND VENUE

### 9.

This Court has jurisdiction over the federal claims in this action in accordance with 28 U.S.C. § 1331 as the claims raise federal questions under the laws and Constitution of the United States.

### 11.

This Court has personal jurisdiction over the individual Defendants because they are domiciled in Polk County, Florida.

### 12.

Venue is proper in the Middle District of Florida, Tampa Division, under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) as the Defendants reside in this District and all, or a substantial part of all, the events giving rise to the claims occurred within this District.

## STATEMENT OF FACTS

**A.    The worst Hurricane, natural disaster in modern time**

### 13.

In 2017, Hurricane Irma was called one of the strongest storms in recorded history and the strongest ever recorded in the Atlantic Ocean, with a peak intensity of 185 mph, exceeding the likes of Katrina, Andrew and Camille. *See*

*Extreme Category 5 Irma crashes into Caribbean, sets sights on Florida and Southeast*

U.S., WASH. POST (Sept. 6, 2017),

https://www.washingtonpost.com/news/capital-

weather-gang/wp/2017/09/06/extreme-category-5-irma-crashes-into-

caribbean-sets- sights-on-Florida-and-southeast-u-s/.

14.

Hurricane Irma maintained maximum wind speeds of at least 185 mph

longer than any other storm in recorded history **on Earth**. *Id*.

15.

The storm generated the most Accumulated Cyclone Energy, a measure of

both a storm's duration and intensity, of any hurricane on record. Late Tuesday

night, September 5, 2017, the storm's pressure dropped to 914 millibars (the

lower the pressure, the stronger the storm), ranking as the lowest of any storm

on record outside the Caribbean and Gulf of Mexico in the Atlantic basin. Id.

16.

On September 6, 2017, *The Washington Post* reported: "This is a life-

threatening storm that the Hurricane Center warns is capable of catastrophic

damage. Preparations should be rushed to completion along and near its

projected path, including over South Florida." Id.

17.

Forecasters warned that Irma's hurricane-force winds were so wide they could reach from coast to coast in Florida, testing the nation's third-largest state.[1]

18.

"This is a storm that will kill you if you don't get out of the way," National Hurricane Center meteorologist Dennis Feltgen said. "Everybody's going to feel this one." Id.

19.

"Irma killed at least 20 people in the Caribbean and left thousands homeless as it devastated small resort islands." Id.

20.

"Irma trained its sights on Florida and officials warned more than 5 million people that time was running out and ordered them to evacuate ahead of the deadly hurricane as it followed a path that could take it from one end of the state to the other." Id.

---

[1] Curt Anderson and Claire Galofaro, *Irma bears down on Florida; more than 5M told to flee coast*, ABC NEWS (Sept., 2017, 11:28 PM), http://abcnews.go.com/US/wireStory/hurricane-warnings-add-urgency-florida- evacuations-49696526.

21.

In one of the largest evacuations in the history of the United States, about 5.6 million people in Florida — more than one-quarter of the state's population were ordered to evacuate and another 540,000 were told to leave the Georgia coast. *Id.*

22.

Authorities opened hundreds of shelters for people who did not leave. Hotels as far away as Atlanta filled up with evacuees. *Id.*

## B.    Defendants implement checkpoint program to detect ordinary, arrestable crimes

23.

As other counties opened storm shelters and coordinated with privately operated homeless shelters and other facilities to welcome the millions of people seeking refuge from the powerful storm, Polk County Sheriff Grady Judd decided to turn the evacuation into an opportunity trap evacuees who had warrants for any offense and take them to jail, or otherwise deter shelter-seeking evacuees if they had warrants for any offense.

24.

On Tuesday morning, September 6, 2017, from the Polk County Sheriff's official Twitter account, Sheriff Judd tweeted: "If you go to a shelter for #Irma

and you have a warrant, we'll gladly escort you to the safe and secure shelter called Polk County Jail" (see below).

25.

A spokesman for Sheriff Judd said, "We hope it [the emergency evacuation] actually leads to more people turning themselves in."

26.

The purpose of these pedestrian "checkpoints" is to conduct a fishing expedition to find any possible basis, no matter how tenuous, for issuing citations to or arresting human beings seeking refuge from a Category 5 hurricane.

27.

Judd ordered his deputies and other officers to go to the emergency shelters for evacuees from Hurricane Irma to set up and enforce the checkpoints.

28.

Pursuant to Judd's orders, at each checkpoint at the entry way of the emergency shelters, when a person seeking entry to a shelter approaches the shelter, Judd's deputies and subordinate officers order the person to stop moving. On September 9, 2017 as Barreno tried to enter the shelter, Judd's subordinate officer ordered Barreno to stop moving.

29.

After Judd's deputies and subordinate officers order the person to stop moving, Judd's deputies and subordinate officers demand the person show them his/her driver license or identification card. In accordance with this policy, Judd's subordinates told Barreno that he would have to submit to a data criminal warrant/background check.

30.

If the person seeking shelter has his/her driver license or identification card, Judd's deputies and subordinate officers enter the person's information into a computer database and run a criminal background check. In accordance with this policy, Judd's subordinates told Barreno that he would have to submit to a data warrant/criminal background check.

31.

If the person seeking shelter does not have a driver license or identification card with them, then Judd's deputies and subordinate officers take the person's fingerprints. Afterward, Judd's deputies and subordinate officers run a background check—which is more extensive than the check run using a driver license/identification card.

32.

The checkpoints are not based on any suspicion of criminal conduct, evidenced by the fact that the officer who told Barreno he is subject to a warrant/criminal background check also never told Barreno that he was suspected of any crime or illegal act at that time.

33.

Criminal suspicion is not raised by trying to enter an emergency shelter to save one's life and the lives of family members.

**C.    Defendants' claim that they are running warrant checks/criminal background checks to stop sexual predators from entering emergency shelters is a façade.**

34.

Once the story of Judd implementing warrant checkpoints at emergency shelters got out, Judd told the media that his conduct is aimed only toward preventing sexual predators from gaining entry to the shelters.

35.

Judd's statement that the checkpoints—where a person's information was entered into a computer to check for warrants—were aimed only toward preventing sexual predators and sex offenders from gaining entry to the shelters — is a misrepresentation.

36.

The state of Florida requires each person who has been designated a sexual predator or sexual offender who has a driver's license/identification card to have on that card markings—in big bold letters—that said person is a sexual predator or sexual offender:

> It is unlawful for any person designated as a sexual predator or sexual offender to have in his or her possession a driver license or identification card upon which the sexual predator or sexual offender markings required by s. 322.141 [Color or markings of certain licenses or identification cards] are not displayed or have been altered.

§ 322.212(5)(c), Fla. Stat.

37.

Florida law further ensures that the licenses and identification cards of sexual predators and sexual offenders contain clear markings, by mandating the following:

> (3)      All licenses for the operation of motor vehicles or identification cards originally issued or reissued by the department to persons who are designated as sexual predators under s. 775.21 or subject to registration as sexual offenders under s. 943.0435 or s. 944.607, or who have a similar designation or are subject to a similar registration under the laws of another jurisdiction, shall have on the front of the license or identification card the following:

> (a)      For a person designated as a sexual predator under s. 775.21 [The Florida Sexual Predator Act] or who has a similar designation under the laws of another jurisdiction, the marking "**SEXUAL PREDATOR**".

> (b)      For a person subject to registration as a sexual offender under s. 943.0435 [Sexual offenders required to register with the department;

14

penalty] or s. 944.607 [Notification to Department of Law Enforcement of information on sexual offenders], or subject to a similar registration under the laws of another jurisdiction, the marking "943.0435, F.S."

(4)     Unless previously secured or updated, each sexual offender and sexual predator shall report to the department during the month of his or her reregistration as required under s. 775.21(8), s. 943.0435(14), or s. 944.607(13) in order to obtain an updated or renewed driver license or identification card as required by subsection (3).

§ 322.141, Fla. Stat. (bold added).

38.

Because of Florida Statutes §§ 322.141 and 322.212, which require convicted sexual predators and sexual offenders with driver licenses or identification cards to have their status as sexual predators or sexual offenders printed on their driver licenses or identification cards, if a person seeking shelter at an emergency shelter has a driver license or identification card, Sheriff Judd has no legitimate reason to order his deputies and other subordinate officers to enter that person's information in a computer and run a criminal background check and check for warrants. To determine if a holder of a driver license or identification card is a convicted sexual predator or sexual offender, all deputies and officers need to do is check each person's license or ID card for the marking.

39.

Sheriff Judd's statement that the only purpose of his warrant checkpoints is to separate sexual predators and sexual offenders—whether accused or convicted—is also belied by the fact that he proclaimed to the world, through

15

Twitter and to the traditional media, that his deputies and other subordinate officers would be arresting anyone with an outstanding warrant.

40.

Carrie Hortsman, a spokesperson for Sheriff Judd, said that officers at the checkpoints are obligated to take a person into custody if there is a warrant of any kind.

**COUNT ONE (FEDERAL CLAIM)**
**42 U.S.C. § 1983 — MONELL CLAIM DUE TO A FOURTH AMENDMENT**
**VIOLATION REGARDING UNLAWFUL SEIZURE (ARREST) OF MR.**
**BARRENO**

**(Against Defendant Polk County and Sheriff Judd in his official capacity, by Plaintiff Barreno)**

41.

Mr. Barreno hereby reiterates and incorporates by reference the allegations contained in paragraphs 1-39 as if set forth fully herein.

42.

At all times relevant to this Complaint, Mr. Barreno had a clearly established right under the Fourth Amendment to the United States Constitution to be free from unreasonable/suspicion-less seizures of his person by law enforcement officers such as Defendant Judd and his subordinates.

43.

*Based on all facts that have been incorporated to support this Count*, and the fact that Sheriff Judd was the policy maker—on behalf of Polk County—for all matters related to warrant checks and criminal background checks conducted by Judd and law enforcement officials under his command and control, Defendant Polk County had a policy and practice of establishing pedestrian check points at all emergency shelters during the time period of September 7, 2017, through present, to subject persons to unlawful searches and seizures of persons entering said shelter, to include the Plaintiff, Mr. Barreno, and Mr. Barreno was, on September 9, 2017, subjected to such an unlawful seizure by the Defendants.

44.

Due to Defendants' unlawful conduct, based on the facts incorporated into this count and the allegations within this count, Mr. Barreno is entitled to the equitable relief he seeks.

## COUNT TWO (FEDERAL CLAIM)
## 42 U.S.C. § 1983 — SUPERVISORY LIABILITY CLAIM PURSUANT TO FOURTH AMENDMENT VIOLATION REGARDING DEFENDANTS' UNLAWFUL SEARCH OF MR. BARRENO

### (Against Sheriff Judd, in his individual capacity, by Plaintiff Barreno)

45.

Mr. Barreno hereby reiterates and incorporates by reference the allegations contained in paragraphs 1-39 as it set forth fully herein.

46.

At all times relevant to this Complaint, Mr. Barreno had a clearly established right under the Fourth Amendment to the United States Constitution to be free from unreasonable searches or seizures by law enforcement officers such as those officers/deputies under the direct supervision of Judd.

47.

*Based on all facts that have been incorporated to support this Count*, and the fact that Judd, in his individual capacity, was the acting supervisor on law enforcement officers who stopped Barreno at the unlawful pedestrian checkpoint and told him that he must undergo a search and seizure in the form of a warrant/criminal background check prior to entering the subject emergency shelter, Judd authorized, condoned and ratified the unlawful practice of subjecting Barreno to the subject search and seizure.

48.

Due to Defendant Judd's unlawful conduct, based on the fact incorporated into this count and the allegations within this count, Mr. Barreno is entitled to the equitable relief he seeks.

## COUNT III (FEDERAL CLAIM)
## 42 U.S.C. § 1983—REQUEST FOR EQUITABLE RELIEF IN THE FORM OF INJUNCTIVE AND DECLARATORY RELIEF

### (Against all Defendants by all Plaintiffs)

Plaintiffs hereby reiterate and incorporate by reference the allegations contained in paragraphs 1-39 as if set forth fully herein.

49.

***Based on all facts that have been incorporated to support this Count***, Plaintiffs are entitled to declaratory and injunctive relief; this relief serves the public interest and the balance of inequities favor Plaintiffs. Moreover, the irreparable harm that each Plaintiff faces cannot be compensated by money. Furthermore, Plaintiff has no remedy at law.

### ATTORNEY FEES

50.

Plaintiff is entitled to reasonable attorney fees under applicable federal and state law.

## PUNITIVE DAMAGES

### 51.

Plaintiffs reserve the right to amend this complaint pursuant to Florida law to seek punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for the following relief:

1.     That this Court exercise jurisdiction over this case and grant a jury trial;

2.     That this Court decide, as a matter of law, all issues not required to be determined by a jury and declare Defendants' acts unconstitutional;

3.     That this Court award all permissible damages recoverable from the Defendant, including general, special, compensatory, punitive, and any other damages deemed appropriate, in an amount to be determined at trial;

4.     That this Court permit recovery of reasonable attorney's fees and costs in an amount to be determined by this honorable Court under applicable law;

5.     That this Court grant injunctive relief against the defendants; and

6.     That this Court grant any additional relief that this Honorable Court

deems appropriate under the circumstances.

Respectfully submitted this 20th day of April 2018, by:

/s/ Dallas S. LePierre, Esq.
DALLAS S. LEPIERRE, ESQ.
Florida Bar No. 101126
Attorney for Plaintiffs Libre by Nexus and
Andres Barreno
Nexus Derechos Humanos Attorneys, Inc.
44 Broad Street, NW, Suite 200
Atlanta, Georgia 30303
(404) 654-0288 Telephone
(404) 592-6225 Facsimile
dlepierre@ndhlawyers.com
mdobbs@ndhlawyers.com

Also, with respect to providing notice about future pro hac vice status:

Mario Williams
GA Bar No. 235254
Nexus Derechos Humanos Attorneys, Inc.
44 Broad Street, NW, Suite 200
Atlanta, Georgia 30303
(404) 654-0288 Telephone
mwilliams@ndhlawyers.com
(Motion for Pro Hac Vice immediately forthcoming)

/s/MARIO WILLIAMS
GA Bar No. 235254
mwilliams@nexuscaridades.com