IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LIBRE BY NEXUS, and
ANDRES BARRENO,

     Plaintiffs,

v.

SHERIFF GRADY JUDD, in his official
Capacity as Sheriff of Polk County,
Florida, and in his individual capacity, and
POLK COUNTY SHERIFF's OFFICE,

     Defendants.

Case No. 8:18-cv-970-T-35SPF

_____ /

## NOTICE OF FILING

COME NOW the Defendant, SHERIFF GRADY JUDD, in his official capacity as Sheriff of the Polk County Sheriff's Office, by and through the undersigned attorneys, hereby gives notice of filing the following document with the Clerk of Court:

**Transcript of Deposition of Andres Barreno taken on 03/12/19**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 5th day of April, 2019, I electronically filed the foregoing with the Clerk of the Court by using the ECF system which will send a notice of electronic filing to: DALLAS S. LEPIERRE, ESQ., (dlepierre@ndh-law.com;

00696638-1

mdobbs@ndh-law.com), and MARIO WILLIAMS, ESQ., (mwilliams@ndhlawyers.com),

Attorneys for Plaintiffs.

<div style="margin-left:40%">

*s/Hank B. Campbell*

HANK B. CAMPBELL
Florida Bar No. 434515
h.campbell@cttalaw.com
r.roop@cttalaw.com
k.cassata@cttalaw.com
ROBERT J. ARANDA
Florida Bar No. 988324
r.aranda@cttalaw.com
p.roop@cttalaw.com
CAMPBELL TROHN
  TAMAYO & ARANDA, P.A.
Post Office Box 2369
Lakeland, Florida  33806-2369
(863) 686-0043
Attorneys for Defendant

</div>

Page 1

IN THE UNITED STATE DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
CASE NO.: 8:18-cv-970-T-35SPF

LIBRE BY NEXUS, and
ANDRES BARRENO,
   Plaintiffs,

vs.

SHERIFF GRADY JUDD, in his
official capacity as Sheriff
of Polk County, Florida, and
in his individual capacity,
and POLK COUNTY SHERIFF'S
OFFICE.

   Defendants.

DEPOSITION OF ANDRES BARRENO
Taken on Behalf of Defendant

DATE TAKEN:   3/12/2019

TIME:   1:57 P.M. - 4:27 P.M.

PLACE:   WASILEWSKI COURT REPORTING
2005 SOUTH FLORIDA AVENUE
LAKELAND, FLORIDA 33803

Examination of the witness taken before:
Danette V. Lamb
Stenographic Shorthand Reporter
Notary Public

---

Page 2

1    APPEARANCES
2  Counsel for Plaintiffs:
3    DALLAS S. LEPIERRE, ESQUIRE
     Nexus Derechos Humanos
4    Attorneys for Civil Human Rights
     44 Broad Street Northwest
5    Atlanta, Georgia 30303
     404-254-0442
6    diepierre@nhdlawyers.com
7  Counsel for Defendants:
8    HENRY (HANK) B. CAMPBELL, ESQUIRE
     Campbell Trohn Tamayo & Aranda, P.A.
9    1701 South Florida Avenue
     Lakeland, Florida 33803
10   863-686-0043
     h.campbell@cttalaw.com
11
12   ROBERT J. ARANDA, ESQUIRE
     Campbell Trohn Tamayo & Aranda, P.A.
13   1701 South Florida Avenue
     Lakeland, Florida 33803
14   863-686-0043
     r.aranda@cttalaw.com
15
16  Also Present:
17   ANNE GIBSON,
18   Director of Legal Affairs, PCSO
19   DEBORAH OATS, ESQUIRE
20   Florida State Attorney's Office
21
22
23
24
25

---

Page 3

1           I N D E X
2   WITNESS                      PAGE
3   CALLED BY THE DEFENDANT:
4   ANDRES BARRENO
5    DIRECT EXAMINATION BY MR. CAMPBELL      4
6    CROSS-EXAMINATION BY MR. LEPIERRE      53
7    REDIRECT EXAMINATION BY MR. CAMPBELL   61
8    RECROSS-EXAMINATION BY MR. LEPIERRE    71
9
10  CERTIFICATE OF OATH           73
11  CERTIFICATE OF REPORTER       74
12  READ AND SIGN LETTER          75
13  ERRATA SHEET                  76
14
15         E X H I B I T S
16  DEFENDANT'S                   PAGE
17  EXHIBIT NO. 1   Complaint Filed 9/10/17   36
18  EXHIBIT NO. 2   Complaint Filed 4/20/18   41
19  EXHIBIT NO. 3   Defendant's Supplemental  47
                    Response to Plaintiff's First
20                  Request for Production
21
22
23
24
25

---

Page 4

1        THEREUPON, the following proceedings were had
2  and taken at 1:57 p.m.:
3        THE COURT REPORTER:  Do you solemnly swear or
4  affirm that the testimony you are about to give will
5  be the truth, the whole truth, and nothing but the
6  truth?
7        THE WITNESS:  Yes, ma'am.
8        ANDRES BARRENO, called as a witness by the
9  Defendant, having been first duly sworn, testified as
10 follows:
11        DIRECT EXAMINATION
12 BY MR. CAMPBELL:
13   Q.  Would you state your name please, sir?
14   A.  Andres Fernando Barreno.
15   Q.  And, Mr. Barreno, where do you currently live?
16   A.  My physical address here is in Deltona.  1530
17 Copperfield Avenue, Deltona, Florida 32738.
18   Q.  32738?
19   A.  Yes, sir.
20   Q.  And how long have you lived in Deltona?
21   A.  Two and a half weeks — two weeks.
22   Q.  Okay.  That's pretty precise.  Where did you
23 live before Deltona?
24   A.  Clifton, Virginia.
25   Q.  And where in Virginia, where in Clifton?

1 (Pages 1 to 4)

Wasilewski Court Reporting
(888) 686-9890

04229246-bd57-4b74-b67f-bb6a7a142fcd

Page 5

1       A.  13562 Jasper Lane, Clifton, Virginia and the
2   ZIP code is 20124.
3       Q.  And how long did you live in Clifton?
4       A.  About I want to say since July 2005.
5       Q.  Which would include the time of this incident
6   in this particular case back in September of 2017?
7       A.  Yes, sir.
8       Q.  Okay.  And what do you do for a living?
9       A.  I'm a risk manager.
10      Q.  And who are you a risk manager for?
11      A.  Libre By Nexus.
12      Q.  Say that again, I'm sorry.  I'm deaf.  It's not
13  how you're saying it.  It's my hearing.
14      A.  Libre By Nexus or Nexus Services.
15      Q.  Okay.
16      MR. LEPIERRE:  Remember just to speak up just a
17  little bit so the court reporter can hear you
18  clearly.
19      THE WITNESS:  Got it.
20  BY MR. CAMPBELL:
21      Q.  And what do you do as a risk manager for Libre
22  By Nexus?
23      A.  I help clients in emergencies.  I also help the
24  company with day-to-day — day-to-day procedures within
25  my group as a risk manager.  Helping clients, home

Page 6

1   visits.
2       Q.  Okay.  So give me an example of your day-to-day
3   help of clients in emergencies.  Just — and not a
4   particular one, but a general one so I can understand
5   what that includes.
6       A.  I do a lot of different things.  But, for
7   instance, if they're having issues with, I don't know, a
8   GPS device, I go check on their GPS devices and make
9   sure they're comfortable with their GPS, and that could
10  be one of out many.
11      Q.  Okay.  And the GPS device is provided by your
12  company —
13      A.  Yes.
14      Q.  — to clients?
15      A.  Yes.
16      Q.  And what is the purpose of it?
17      A.  We monitor their — we monitor them due to
18  their bonds, you know, that they get released from a
19  detention center.
20      Q.  Okay.  And then you mentioned home visits with
21  clients, is that something different or does it include
22  other types of assistance that you provide them or is
23  that just more a part your monitoring of them and their
24  needs?
25      A.  Assistance that we provide.

Page 7

1       Q.  Okay.  And then you said you "help the company
2   with day-to-day procedures within your group," what does
3   that mean?  What's an example of that?
4       A.  If there is an issue in one of our offices, we
5   go and assess the situation.  If there is an issue with
6   an employee or if an employee needs help in one of our
7   offices, we are like the 911 for the company.
8       Q.  And when you say "we," do you mean those in
9   risk management or is it a different division or what —
10  how would I describe who "we" are as the 911 for the
11  company?
12      A.  Risk managers.
13      Q.  Okay.  Sounds kind of like troubleshooting both
14  for clients and the company?
15      A.  Correct.
16      Q.  Or as they would say in Ray Donovan, you're a
17  fixer, but not like Ray Donovan, which you may not know
18  of, but one of my favorite shows.  You don't have to
19  answer that, that was just a generic comment, that
20  should be stricken from the record.
21      And how long have you been with Libre By Nexus?
22      A.  May 5th will be my fourth year.
23      Q.  So May 5 of '15 was when you joined them?
24      A.  Yes.
25      Q.  And have you been a risk manager throughout?

Page 8

1       A.  Yes.
2       Q.  And let's go back a little bit.  Give me your
3   educational background, just where you graduated from
4   high school and anything post high school?
5       A.  I graduated from Sanibel High School in
6   Clifton, Virginia.  I attended ITT Tech and got my
7   bachelors in criminal justice, and then worked.
8       Q.  And have you worked at other places
9   between getting your criminal justice bachelors and
10  Libre By Nexus?
11      A.  I worked in the criminal defense attorney — an
12  immigration attorney in Fairfax, Virginia.  I did
13  security in Virginia, and then Nexus.
14      Q.  Okay.  So first out of school you worked for a
15  criminal immigration attorney in Fairfax?
16      A.  While I was going to school.
17      Q.  Oh, while — while in school, okay.
18      A.  Sorry, yes.
19      Q.  And just what in general did you do for that
20  attorney?
21      A.  Court documents, I interpreted for him, helped
22  out with research, cases.  A little bit of everything.
23      Q.  Okay.
24      A.  Of — of what they needed help with in cases
25  just the little stuff, you know.

2  (Pages 5 to 8)

04229246-bd57-4b74-b67f-bb6a7a142fcd

Page 9

1    Q.  Okay.  And then security.  Who did you work in
2  security with?
3    A.  Securitas.
4    Q.  Secure tox?
5    A.  Tas, T-A-S at the end Securitas.
6    Q.  And where in Virginia are they?
7    A.  Their main office, their regional office is in
8  Falls Church, Virginia.
9    Q.  And how long were you with them?
10   A.  Two -- two years.
11   Q.  And what in general did you do for Securitas?
12   A.  Site security.
13   Q.  I'm sorry?
14   A.  Site security.
15   Q.  Who is your immediate supervisor at Libre By
16 Nexus?
17   A.  His name is Eddie DeLeon.
18   Q.  DeLeon?
19   A.  DeLeon.
20   Q.  And is that your supervisor now that you're in
21 Deltona, or has he been your supervisor before that?
22   A.  No.  He's -- he's the East Coast supervisor.
23 So he's been my supervisor before Deltona.
24   Q.  Okay.  Meaning, East Coast, not east coast of
25 Florida, East Coast of the United States?

Page 10

1    A.  Of the United States, correct.
2    Q.  Okay.  And where is he located?  Where is his
3  primary office?
4    A.  He is in Verona, Virginia.
5    Q.  Okay.  Back in September of 2017, I know from
6  the complaint, that you allegedly came to Florida as a
7  result of Hurricane Irma approaching Florida; is that
8  accurate?
9    A.  No.  I --
10   Q.  Okay.  Thank you for telling me that.  That's
11 really good.  I shouldn't have assumed.  So what were
12 you doing in Florida in September of 2017?
13   A.  I came to Florida prior to Irma actually
14 because I was working in South Florida with clients.
15   Q.  Okay.  Do you recall when you came to Florida?
16   A.  It must have been -- I don't know dates
17 exactly, because it's been a while, but it must have
18 been a week and a half or two weeks before Irma.
19   Q.  And were you here in Florida for that entire
20 week and a half or two weeks prior to Irma?
21   A.  Yes, sir.
22   Q.  And so why did you come to Florida other than
23 for Irma?
24   A.  We had home visits and, you know, compliance
25 visits and all that here in South Florida.

Page 11

1    Q.  And what do you include in South Florida,
2  'cause people include so many different areas?
3    A.  Right.
4    Q.  So many people say I'm in South Florida right
5  now, which really offends me, but lots of people do.
6    A.  South Florida I consider from Fort Lauderdale
7  to Key West, Marco Island, you know, the whole south, I
8  guess, of Florida.
9    Q.  Okay.  And is there an office you work out of
10 when you're working in South Florida with clients with
11 home visits and compliance?
12   A.  At this point, that office is no longer in
13 South Florida, but when I came back in the September,
14 yes, there was an office five minutes from the airport.
15   Q.  From which airport?
16   A.  Miami International.
17   Q.  Okay.  So a week and a half and two weeks
18 before Irma you were already down here working your
19 normal job with clients with home visits in compliance?
20   A.  Correct.
21   Q.  What was the first thing that changed about
22 that with the approach of Irma, if anything?
23   A.  Our clients started calling us, scared of -- of
24 the storm coming through and were requesting for help.
25   Q.  Okay.  And do you recall when that began?

Page 12

1    A.  I'm not sure of exact dates, but I want to say
2  several days before Irma hit the -- the state.
3    Q.  I'm sorry?
4    A.  Several days before it hit Florida.
5    Q.  You began -- you and your company began getting
6  calls from scared clients requesting help?
7    A.  Correct.
8    Q.  And what was their requests as far as what type
9  of help were they looking for?
10   A.  They either needed relocation help or some type
11 of food assistance, you know, water, just help in
12 general.  These people don't know what they need to do
13 in these locations so they call for help.
14   Q.  What type of help were you then giving in the
15 days approaching September 10th, when Irma made landfall
16 in to South Florida, which that was a Sunday, if that
17 helps any.  But I have a cheat sheet here I'm looking
18 at, but --
19   A.  We provided, like I said, food, water.  We also
20 started looking into putting our clients into shelters
21 because that was one of the main requests that they
22 called for.
23   Q.  Okay.  When did you first come to Polk County
24 in relation to Irma?
25   A.  I want to say two days before Irma hit the

3 (Pages 9 to 12)

04229246-bd57-4b74-b67f-bb6a7a142fcd

## Page 13

1    state.

2        Q.   Okay.  And the complaint says that you tried to

3    enter a shelter on September 9, 2017, would that have

4    been the day you came to Polk County?

5        A.   I -- we -- we came -- go ahead and repeat the

6    question, please.

7        Q.   And I won't be able to, but I'll ask her to

8    read it back and that'll be better than me trying to ask

9    it.

10       A.   Sure.

11           (The record was read by the court reporter.)

12       A.   That was the day that we tried to enter the

13   shelter, but I was here before.

14   BY MR. CAMPBELL:

15       Q.   Okay.  Tell me about when you were here before

16   in Polk County the day you tried to enter the shelter?

17       A.   The day before.

18       Q.   Okay.  Had you ever been to Polk County before

19   September 8th of 2017?  And that, by the way, was a

20   Friday.

21       A.   No, sir.

22       Q.   How did you get to Polk County September 8th of

23   2017?

24       A.   I drove.

25       Q.   What did you drive?

## Page 14

1        A.   I drove a 15-passenger van.

2        Q.   And who did you have with you?

3        A.   It was just me.  It was just me.

4        Q.   Okay.  Did Libre By Nexus, did it have clients

5    in Polk County?

6        A.   Yes.

7        Q.   How many?

8        A.   I couldn't tell you.  I don't know that answer.

9        Q.   Okay.  Were you up here to assist those

10   clients?

11       A.   Yes.

12       Q.   Now, how would you find that information if you

13   were looking for it?  How would you find the information

14   of who your clients were that you were trying to assist

15   on September 8th and 9th of 2017?

16       A.   Our -- we had a list of people that called, and

17   we also have a client database of clients, you know, that

18   we -- we know which clients are where.

19       Q.   Okay.  So you drove up here from Miami on

20   September 8th, 2017?

21       A.   Yes.

22       Q.   And where did you stay that evening?

23       A.   To be exact, I don't know the exact resort, but

24   we stayed in a resort close to Interstate 4, close to

25   the parks I guess.  I'm not really familiar with the

## Page 15

1    state, but I guess close to Kissimmee.

2        Q.   Okay.  And when you say "we," who do you mean?

3        A.   The emergency group that responded --

4    voluntarily responded to helping clients with the storm.

5        Q.   Okay.  And who was in that group?

6        A.   I can't remember names exactly, but it was -- I

7    want to say six guys --

8        Q.   And -- sorry?

9        A.   -- and six -- six girls, six guys, a total of

10   about a dozen of us.

11       Q.   And did they all work for Libre By Nexus?

12       A.   Yes, sir.

13       Q.   So what did you do on September 8th after

14   arriving up here from South Florida and obviously before

15   spending the night at this resort near Kissimmee with a

16   dozen or so other responders?

17       A.   We went shopping for our clients' needs.  They

18   requested, you know, water, food, and -- and

19   necessities, you know.  When they made the phone call,

20   they obviously requested.

21       Q.   Okay.  What else did you do on September 8th of

22   2017, other drive up and then shopping for clients for

23   their requested necessities, water, food, et cetera?

24       A.   We pretty much just got ready for, you know, to

25   help clients.  We -- we bought gas so we don't get

## Page 16

1    stranded in the middle of a storm.  We -- at the end of

2    the day, we got together and, you know, amongst us we

3    talked about our clients that we needed to go visit.

4    The ones -- the clients that we felt like they can't

5    stay in their homes through the storm.  The clients that

6    needed immediate help and we were giving -- we were

7    given a list of clients that we needed to visit.

8        Q.   And who gave you that list?

9        A.   The person in charge of the -- of the emergency

10   responding group.  At that point it was Tim Shipe.

11       Q.   Tim?

12       A.   Tim Shipe.

13       Q.   Can you spell that for me, the last name?  I

14   got Tim.

15       A.   S-h-i-p, as in Paul, e.

16       Q.   And is he still with Libre By Nexus?

17       A.   Yes.  Yes, sir.

18       Q.   And where is he located?

19       A.   Verona, Virginia.

20       Q.   Okay.  So you're buying necessities, you're

21   buying gas, you're meeting and discussing priorities

22   obviously among clients, those that need visits, those

23   that need immediate help.  Those that need, I guess,

24   shelter?

25       A.   Transportation for sure, as well.

Wasilewski Court Reporting
(888) 686-9890

04229246-bd57-4b74-b67f-bb6a7a142fcd

Page 17

1    Q.  Transportation.  Anything else you can think of
2  on the 8th?
3    A.  No, sir.
4    Q.  Okay.  Tell me what you recall about Saturday
5  September 9 then --
6    A.  Recall about --
7    Q.  That's the day you -- according to the
8  complaint that's the day you went to the shelter.  So
9  the next day walk me through your day.  You woke up in
10  the morning until the end of the day?
11    A.  The priority that day was to find shelter for
12  our clients and we needed to verify that these shelters
13  were close to their homes or further out, other homes.
14  We visited the -- the shelter to get more information
15  due to our clients being scared of getting in a
16  situation that they've been before and they didn't want
17  to go through that.
18    Q.  Okay.  You said visited the shelter, which
19  shelter do you mean there?
20    A.  I don't remember the name of the shelter, but
21  it was the high school where -- where this incident
22  happened.  It was the first shelter.
23    Q.  Okay.  You're talking about the shelter in Polk
24  County?
25    A.  Yes.

Page 18

1    Q.  Okay.  And you said "high school"?
2    A.  Like I said, I don't remember exactly.  It's
3  been a long time, but I think it was the high school.
4  It was a high school or a school.
5    Q.  How did you choose the school that you went to?
6    A.  We went on -- well, the person in the charge
7  went on a web page for emergencies in Polk County, and
8  different counties actually, not just Polk County, and
9  it said which schools they were providing shelter for
10  people, for people to ride out the storm.
11    Q.  Okay.  Who went on the web page looking for
12  shelters that provided emergency --
13    A.  Tim Shipe.
14    Q.  I'm sorry?
15    A.  Tim Shipe.
16    Q.  Okay.  Tim Shipe.
17     Now, at that time was -- were you aware of the
18  reports of Sheriff Judd stating that driver's license
19  would be checked at shelters?
20    A.  We were told by our clients that they were
21  requesting IDs.
22    Q.  So had some of your clients gone to a shelter
23  and been requested to provide an ID?
24    A.  I'm not sure if they physically went to a
25  shelter, but we were told by our clients that they were

Page 19

1  requesting IDs.
2    Q.  Okay.  And you mentioned that you wanted to
3  visit the shelter to get information due to clients
4  being scared of being in a situation they had been in
5  before.  What -- what did you mean by that?
6    A.  So just to give you a little background.  Our
7  clients are undocumented immigrants.  Now, these people
8  are scared of going back to detention centers, which
9  it's a bad experience for them and that's the reason why
10  they called us because they needed help to get into a
11  shelter but they didn't know if that was going to affect
12  them in any way.
13    Q.  Well, how would being an undocumented immigrant
14  being asked for a driver's license cause them to go back
15  to a detention center?
16    A.  I'm not sure of the legality, but what I know
17  of my experience is that as soon as they are in contact
18  with a public official or police officer or anyone that
19  asks for their IDs, they're going to have to get
20  identified.  And if they don't have an ID, they won't be
21  able to get identified.  So they will get detained until
22  they can prove that is the person that they say they
23  are.
24    Q.  So your clients that are undocumented
25  immigrants, if they're asked to produce an ID and they

Page 20

1  don't do so, they get detained?
2    A.  Well, until they figure out who they are, yes.
3    Q.  Have any of your clients ever reported that
4  happening in Polk County?
5    A.  I don't know.
6    Q.  That they're asked to produce an ID and they
7  didn't produce one so they then got detained?
8    A.  I don't know about Polk County, but I've seen
9  it in other places.
10    Q.  Okay.  So your clients do not want to be asked
11  for an ID because they're scared of being detained as a
12  result; is that accurate?
13    A.  It's not that they don't want to be asked for
14  an ID; it's that they can't provide an ID.
15    Q.  Well, since they can't provide one, is that why
16  they want to avoid being asked for one?
17    A.  Correct.
18    Q.  Okay.  Other than your clients making you aware
19  of reports that driver's licenses or other
20  identification were being requested at the shelter, did
21  you have any other information prior to your going to
22  the school on September 9, 2017 --
23    A.  No.
24    Q.  -- about that occurring?
25    A.  No.

5  (Pages 17 to 20)

04229246-bd57-4b74-b67f-bb6a7a142fcd

Page 21

1    Q.  And so who went to the school that you went to?
2    A.  A coworker and I.
3    Q.  And who was the coworker?
4    A.  Her name is Melissa Acosta.
5    Q.  And is she still with Libre?
6    A.  Yes, sir.
7    Q.  And where is she located with Libre?
8    A.  Verona, Virginia.
9    Q.  Did you have any of your clients with you?
10   A.  At the moment going into the premises, no.
11   Q.  Okay.  So it was just you and Melissa Acosta?
12   A.  Right.  We got --
13   Q.  Okay.  I'm sorry.  Go ahead.
14   A.  I'm sorry.  We had clients waiting for the
15   result of -- of the visit.
16   Q.  And what was the result they were waiting on
17   whether or not identification was being asked for?
18   A.  Correct, correct.
19   Q.  And how had the particular school that y'all
20   went to, how was it chosen?
21   A.  It was actually the first one that I
22   particularly chose because it was closest to the
23   clients' homes.
24   Q.  Okay.  Where were the client -- not meaning an
25   address or anything.  But where were the clients' homes

Page 22

1    that it was closest to?
2    A.  Within a ten-mile radius, seven-mile radius.
3    Q.  When you -- when you looked at the web page to
4    see, did you notice that there were a number of schools
5    that were open for shelters in Polk County?
6    A.  I did not go on a web page.
7    Q.  Okay.  How did you choose this one, though?
8    You said this was the first one I chose?
9    A.  Because it was the closest to the clients'
10   home.
11   Q.  And how did you determine that without going on
12   the web page?
13   A.  I -- we were given a list of the shelters by
14   Tim Shipe, that's what he went on the web page for.  And
15   I -- I literally said we're going to this one because
16   they're closer to their homes.
17   Q.  And do you remember where in general this
18   school was?
19   A.  I do not.
20   Q.  Do you recall how you got there?
21   A.  We drove there.
22   Q.  And do you recall the route you took?  That was
23   a good answer to a bad question.
24   A.  I don't -- I don't recall.  All I know is it
25   was the closest school.

Page 23

1    Q.  To your clients who I can't identify.  Where --
2    where were -- can you identify the area where they were?
3    A.  I'm not sure of the exact location.  Again,
4    it's been a while, but I know that it was -- it was
5    close enough to that specific shelter.
6    Q.  Do you remember what community it was in or
7    they were in?
8    A.  I can't remember.
9    Q.  Do you recall what time of day you arrived at
10   the school?
11   A.  I -- I don't know the exact time, but it was
12   somewhere around noon.
13   Q.  Do you recall what you had done that day prior
14   to arriving at the school other than obviously choosing
15   this school with the information provided to you by
16   Mr. Shipe?
17   A.  That morning we sat down, one van was going to
18   double-check information on IDs and, you know, shelter
19   and all that type of information.  And then the other
20   van was going to go pick up the clients.  And we met
21   close to the shelter, and then Melissa and I went into
22   the shelter, into the school.
23   Q.  Can you describe what the school looked like?
24   A.  Bricks.
25   Q.  Okay.

Page 24

1    A.  I mean, to be honest, with you I don't -- I
2    don't remember.
3    Q.  Was it one or two stories?
4    A.  It -- the entrance was a one story right when
5    we went in through the front door.
6    Q.  Do you recall any ball fields or anything
7    around it, or can you describe anything else about it?
8    A.  We parked in a quite big parking lot and then
9    we walk up to -- we walked up to the front door, three
10   flags, three tall poles, you know, flags, US, Florida,
11   and then the county and which, you know -- but I don't
12   -- I don't remember anything else.
13   Q.  Where was the big parking lot in relation to
14   the front door, was it right up front or was it on the
15   side or do you recall?
16   A.  Diagonal.
17   Q.  Diagonal, meaning?
18   A.  To the -- to the right.
19   MR. CAMPBELL:  Why don't we take a short break.
20   (Off the record.)
21   BY MR. CAMPBELL:
22   Q.  I'm going to show you this on a tablet, so
23   it's not very official.  But that's the bottom.  That
24   bottom picture there is a picture of the front of the
25   school, the school that purports to be where you went.

6  (Pages 21 to 24)

04229246-bd57-4b74-b67f-bb6a7a142fcd

Page 25

1  I don't know that, but does that look familiar to you?
2     A.  Yes.
3     Q.  Does that look like the school you went to?
4     A.  Yes, when I see the name.  Yes, Chain of Lakes.
5     Q.  Chain of Lakes Elementary?
6     A.  Yeah.
7     Q.  Okay.  And then I can show you here.  This may
8  help too, I don't know.  It's too big now.
9        This is on Google Maps, and I could show you —
10  and if this help you to be sure or not, I don't know —
11  but the point there is showing Chain of Lakes.  Here is
12  I-4 and 27 with the Kissimmee resort area up there.
13  Does that look like in the general area of where you
14  were looking when you were looking at the information
15  provided by Mr. Shipe?
16     A.  Yes.
17     Q.  In other words, just south and east of Winter
18  Haven, south of Haines City, obviously, Bartow and Lake
19  Wales are below it?
20     A.  (Nods head.)
21        MR. LEPIERRE:  You have to give a verbal
22  answer.
23     A.  Yes.  I mean, it looks like the area we — we
24  went for our clients, you know, to assist them, yes.
25  BY MR. CAMPBELL:

Page 26

1     Q.  And you recognize the Chain of Lakes name?
2     A.  Yes.
3     Q.  Okay.  All right.  So noon-ish you and your
4  coworker arrived there.  After you parked, what happened
5  next?  Melissa Acosta, sorry.
6     A.  We — we received a call saying that the family
7  — or the clients and their families were on their route
8  to — to a nearby store to wait on our — on our
9  information.  And we got out of the car and we started
10  walking into the school, the front doors.
11     Q.  Okay.  And describe what you can recall about
12  where you were walking into at the front doors.
13     A.  We started walking towards the front doors.  We
14  went through the front doors and immediately after the
15  front doors there were — there was a female officer
16  sitting a the podium right on the — on the right side
17  after you went in through the front doors.
18     Q.  In uniform?
19     A.  Yes, sir.
20     Q.  Okay.  And what happened next?
21     A.  I walked up to the podium and I asked her what
22  — what is the procedure and what are the requirements
23  to enter the shelter.
24     Q.  And what did she say?
25     A.  She said that there needed — the person coming

Page 27

1  in needed to have an ID so they know who is coming in —
2  into the shelter.
3     Q.  Okay.  And what happened next?
4     A.  I asked her what type of ID, and she said a
5  government issued ID.
6     Q.  Okay.  And what else?
7     A.  And then I asked her what would happen if the
8  person doesn't have an ID.
9     Q.  Okay.
10     A.  And she replied that if the person didn't have
11  an ID, they needed to provide their full name, date of
12  birth.
13        And I asked — I asked, you know, what happens
14  if they don't want to provide, you know, that
15  information.
16        Then she said then they fingerprint.  They
17  needed to run fingerprints and she pointed to her right
18  side and there was like a little machine I guess for
19  fingerprints, I'm not sure.  And said, you know, we will
20  need fingerprints to identify the person.
21     Q.  Okay.  What next?
22     A.  And then I asked her if the person didn't want
23  to provide fingerprints, you know, what would happen.
24        And she said, Well, I can't allow just anyone
25  to come in.

Page 28

1        And then I asked her, What exactly are you
2  looking for when the person gets fingerprinted?
3        And she said that they — that they weren't
4  looking for anything specific, but if the person had
5  warrants or had prior felonies or, you know, child abuse
6  charges or anything like that they will — they will act
7  upon that.
8     Q.  Okay.  And what next?
9     A.  That was — that was the conversation, you
10  know.  I had enough information for what I needed to do.
11     Q.  Can you describe the deputy for me?
12     A.  I — I can't remember her name.  I know it was
13  a white female.  That's — that's about it.
14     Q.  Do you recall dark-haired, blonde-haired?
15     A.  Blonde hair.
16     Q.  Okay.  And was she the only law enforcement
17  person you saw there at the front entrance when you went
18  in the doors?
19     A.  No.  There was another officer on her right
20  side, Hispanic descent, because her last name was
21  Hispanic.  She did not speak at all.  And there were two
22  male officers on the other side of the podium.
23     Q.  When you say "podium," what are you meaning
24  there?  Describe that for me.
25     A.  It was I want to say a desk.  It was more of a

Wasilewski Court Reporting
(888) 686-9890

04229246-bd57-4b74-b67f-bb6a7a142fcd

Page 29

1    desk.
2        Q.   Okay.
3        A.   She was sitting there with the other Hispanic
4    officer that was on her right side.  They had documents.
5    They had a little -- the little machine on their right
6    side.  Just a desk with documents, papers on it.
7        Q.   Did you see the sign-in log there?
8        A.   There was a sign-in log and that was on the
9    left side.
10       Q.   Can you describe either of the two male
11   officers that were on the other side of the desk?
12       A.   No.
13       Q.   Do you recall anything about them white, black,
14   Hispanic, anything?
15       A.   If I tell you, I'd be lying to you.  No, I
16   don't.
17       Q.   Oh, no, no, no.  I don't want you to guess.
18   That's -- you're doing the right thing.  If you don't
19   know, that's a fair answer.
20            Were they also in uniform?
21       A.   Yes.
22       Q.   All of the officers were in unform?
23       A.   Yes.
24       Q.   And the other officer to the right of the
25   officer that you talked to, that was a lady of Hispanic

Page 30

1    descent based upon her -- you saw her name tag?
2        A.   Yes.
3        Q.   Okay.  But you don't recall her name?
4        A.   If I'm -- if I'm not -- it's -- the last name
5    started with an R.  I -- I can't -- I can't remember.
6        Q.   Okay.  That can help.
7            Okay.  Let me go over and just make sure I have
8    everything.  You said by the time you concluded the
9    conversation you related with the first officer, you had
10   had all the information you needed to go back to your
11   clients?
12       A.   Yes.
13       Q.   And that information that you had was that
14   someone entering the shelter needed to have an ID?
15       A.   Yes.
16       Q.   So that they could know who was coming into the
17   shelter?
18       A.   Correct.
19       Q.   That ID needed to be a government issued ID?
20       A.   Correct.
21       Q.   If there was no government issued ID, they
22   would need to have a full name and date of birth?
23       A.   Correct.
24       Q.   And if they didn't want to provide that, then
25   they would have to run their fingerprints through the

Page 31

1    fingerprint machine to her right, which would provide
2    information to the officer?
3        A.   Correct.
4        Q.   And that while they weren't looking for
5    anything specific with the fingerprint device, if a
6    person had warrants or prior felonies or child abuse
7    felonies then they would act upon that?
8        A.   Correct.
9        Q.   Anything else you recall at all about the
10   conversation with the lady deputy at the front of the
11   school?
12       A.   Not that I remember at this moment, no.
13       Q.   What did you and Ms. Acosta then do?
14       A.   We left the premises.
15       Q.   Have you ever been back to the premises?
16       A.   No.
17       Q.   Have you been back to Polk County since your
18   time here during Hurricane Irma?
19       A.   No.
20       Q.   Until today?
21       A.   (No response.)
22       Q.   That's correct?  I'm sorry.
23       A.   I'm sorry, I couldn't hear you.
24       Q.   That's correct that until today you haven't
25   been back to Polk County?

Page 32

1        A.   Correct.
2        Q.   Now, you were not seeking shelter, correct?
3        A.   I was.
4        Q.   For --
5        A.   If we were allowed, and -- and my clients felt
6    safe, I -- I was staying with them.
7        Q.   Okay.
8        A.   That was -- that was the main issue.  We were
9    there to assist and help with as much as we could.
10       Q.   So you were actually going to stay in the
11   shelter?
12       A.   Yes.
13       Q.   And was Ms. Acosta also going to stay in the
14   shelter?
15       A.   I'm not sure about her, but we didn't discuss
16   that much.  But me, as a risk manager, I -- I was
17   willing to stay in the shelter.
18       Q.   So which shelter did you then spend that night
19   September 9 of 2017 in?
20       A.   We didn't spend a night in a shelter.
21       Q.   Why not?
22       A.   Because our clients did not feel safe going
23   into a shelter.  They did not want to go through the
24   same situation they were when -- when they were
25   detained.

8 (Pages 29 to 32)

04229246-bd57-4b74-b67f-bb6a7a142fcd

Page 33

1    Q.  So where did you then stay on September 9, that
2  was a Saturday, before the storm hit Florida on Sunday
3  and Polk County on Monday, where did you then stay on
4  September 9?
5    A.  We -- we stayed at the resort we rented and so
6  was our clients.
7    Q.  Oh, and the clients stayed there too?
8    A.  Correct.
9    Q.  And how many nights did y'all spend then at the
10 resort with the clients?
11   A.  Just -- just that night until we went back and
12 dropped them off at their home.
13   Q.  The day before the hurricane got here?
14   A.  No, it was after the hurricane.  We dropped
15 them off at home.
16   Q.  Right.  The hurricane came to Polk County --
17 well, I want you assume that the information I have
18 written down is that the hurricane came to Polk County
19 on Monday, September 11, 2017, okay?
20   A.  I don't recall the dates.  But the night the
21 hurricane hit we were inside the resort rooms.  And I
22 can tell you that because a tree fell in front of our --
23 our -- our -- in front of our room and then the next day
24 we helped the families go back, you know, to resume
25 their normal lives.

Page 34

1    Q.  Okay.  So if my calculation is correct, and
2  your complaint is correct, you went to the shelter on
3  September 9, and so that would have meant at least two
4  nights staying with the family at the resort; is that
5  inconsistent with your recollection?
6    A.  I don't recall exactly how many -- how many --
7  I don't -- I don't remember.  I mean, nights.  I have to
8  drag [sic] my memory.  But I do remember we -- the night
9  of the hurricane, we were all in -- in the resort.
10   Q.  Okay.  And then the next day you took the
11 families back home.  What did you then do that next day?
12   A.  I want to say I went -- I don't -- I don't
13 remember.  It was -- it was -- the experience of the
14 hurricane was just a lot.  So I think we -- we got our
15 stuff.  We -- we had one last meeting with everyone.  We
16 went to check on a few clients in Tampa and make sure
17 everyone was okay and did they need anything else.
18 Pretty much, you know, the water, the food.
19   Q.  Okay.  And then where did you then head next
20 after going to Tampa then you took to check on a few
21 clients to make sure they didn't need anything else?
22   A.  Then we started driving up north.
23   Q.  And you drove back to Virginia?
24   A.  Yes.
25   Q.  I guess once the storm cleared?

Page 35

1    A.  Correct.
2    Q.  Now, you said before you went to Chain of Lakes
3  Elementary School, the only information you had about
4  checking IDs at the shelter was provided by your
5  clients; is that correct?
6    A.  Correct.  Before -- before we even started the
7  emergency relief group, the calls came in saying that
8  they were scared because they didn't know where to go.
9  I don't know if they heard or they went to a shelter and
10 asked for IDs, I'm not sure.  But the information was
11 that they were scared because IDs were being checked as
12 you were going into the shelters.
13   Q.  Were you ever provided additional information
14 with regard to the checking of IDs at shelters in Polk
15 County?
16   A.  No.
17   Q.  You weren't ever provided copies of the tweets
18 that are talked about in your complaint about the
19 shelter?
20   A.  No.
21   Q.  Have you ever looked at them ever?
22   A.  After -- after the complaint was issued, yes,
23 you know, a few weeks later.  But the actual tweets, no.
24 I read, you know, the -- the news articles and all that
25 but not the actual tweets.  I don't know exactly what

Page 36

1  the gentleman said.
2    Q.  Okay.  And what you did see was after the
3  complaint?
4    A.  Correct.  The -- the news articles about --
5  about the case.
6    Q.  Okay.  About the filing of the lawsuit and
7  everything?
8    A.  Correct.
9    Q.  Okay.  Now, that's interesting.  The original
10 lawsuit was filed in Polk County, correct?  Are you
11 familiar with that in state court in Polk County; do you
12 remember that?
13   A.  I'm not -- I'm not familiar.
14   Q.  Here I can provide you a copy.  This is a copy
15 of the original complaint.
16     MR. CAMPBELL:  We can mark this as Exhibit 1.
17     (Defendant's Exhibit Number 1 was marked for
18     identification.)
19   Q.  Does that appear to be the complaint?  And
20 spend as much time with it as you want or as little time
21 with it as you want.  Does that appear to be the
22 complaint that was filed on your behalf and on behalf of
23 Libre By Nexus in Polk County?
24   A.  Yes.
25   Q.  And at the top it shows the filing date and

9  (Pages 33 to 36)

04229246-bd57-4b74-b67f-bb6a7a142fcd

Page 37

1    time; do you see that?
2        A.  Yes.
3        Q.  What is that for the record?
4        A.  September 10th, 2017.
5        Q.  That's before the hurricane even got here,
6    isn't it?
7        A.  I'm not -- I'm not sure when the hurricane hit.
8        Q.  Do you know how it was possible that this
9    complaint was filed on your behalf in Polk County on
10   Sunday at 4:39 in the afternoon, the day before
11   Hurricane Irma came to Polk County as Cat 2 storm?
12       MR. LEPIERRE:  Object to that to the extent it
13   asks for any conversations he -- any conversation he
14   had with his attorneys.
15       MR. CAMPBELL:  Absolutely.  I'm sorry.
16       MR. LEPIERRE:  Do not give any information
17   about conversations you may have had with our office
18   and any of the attorneys.  But other than that, you
19   can answer the question with that caveat.
20       A.  Can you repeat the question?
21   BY MR. CAMPBELL:
22       Q.  Yes.  Do you know how it came to be, other than
23   conversations with your attorney, that this complaint
24   was filed on your behalf in Polk County on Sunday
25   afternoon at 4:39 p.m., the day before Hurricane Irma

Page 38

1    got to Polk County?
2        A.  The information -- the information that we
3    gathered when we did the shelter visit was before the
4    hurricane.
5        Q.  Right.  That would have been the day before
6    this was filed.  About 28 hours before this was filed,
7    you actually arrived at Chain of Lakes Elementary School
8    28 hours before this lawsuit was filed; does that sound
9    correct?
10       A.  Yes.
11       Q.  And the next two days you spent with your
12   families dodging the hurricane at the resort until it
13   had come through, correct?
14       A.  Yes.
15       Q.  What -- strike that.  Never mind.  That was
16   going to violate attorney-client privilege all over the
17   place, even I could recognize it.
18           This complaint alleges that the deputy ordered
19   you to stop moving; do you recall that?
20       A.  No.
21       Q.  Do you recall any orders by the deputy
22   whatsoever instructing you to do anything?
23       A.  No.
24       Q.  How did the deputies treat you?
25       A.  They were professional.

Page 39

1        Q.  They answered your questions?
2        A.  Correct.
3        Q.  This says that the deputies and subordinate
4    officers demanded that you show them your driver's
5    license or identification card; did that ever happen?
6        A.  No.
7        Q.  This says the deputies told you that you would
8    have to submit to data criminal warrant, slash,
9    background check; did that ever happen?
10       A.  No.
11       Q.  Do you know what a data criminal
12   warrant/background check is?
13       A.  I -- I have an understanding of it, yes.
14       Q.  Tell me, because I don't.  The data is what
15   throws me, but I don't -- so what does that mean to you
16   data criminal warrant/background check?
17       A.  I guess check -- checking names on -- on their
18   system and see if they have any -- any records.
19       Q.  This says that at that shelter the deputies
20   were running computer database and criminal background
21   checks.  Were you ever told that?
22       MR. LEPIERRE:  At this point, I'm just going to
23   object.  It's irrelevant since this isn't the
24   operative complaint.
25       MR. CAMPBELL:  Oh, I think it's in the new

Page 40

1    complaint.  Hang on, let me make sure it's -- well,
2    let me finish that question because I'll forget it.
3    BY MR. CAMPBELL:
4        Q.  Did anybody there, any of those deputies ever
5    tell you that they were running computer database
6    warrant/background checks?
7        A.  They said that they were checking -- they would
8    check information with fingerprints.
9        Q.  If someone failed or refused or was unable to
10   provide an ID or their full name and date of birth, then
11   in order to get in they would have to do the fingerprint
12   check, correct?
13       A.  Correct.
14       Q.  And with regard to that fingerprint check, then
15   warrants or prior felonies or child abuse felonies,
16   those would have to be acted upon, correct?
17       A.  Yes.
18       Q.  Okay.  Do you know how a driver's license ID
19   check was being done at the Chain of Lakes school on the
20   day you went there September 9 of 2017?
21       A.  No, I don't.
22       MR. CAMPBELL:  Now, let me go check that other
23   one just to make sure, because I do have it.
24       MR. LEPIERRE:  And I hate to do this to you,
25   but if I can take just a few minutes.  I have like

10  (Pages 37 to 40)

04229246-bd57-4b74-b67f-bb6a7a142fcd

Page 41

```
1     four calls to --
2         MR. CAMPBELL: Oh, no. Absolutely. Let's take
3     another break.
4         (Off the record.)
5     BY MR. CAMPBELL:
6         Q.  Okay. Let me hand you what we'll mark as
7     Exhibit 2 to the deposition. This is the federal
8     complaint and just let me just clarify 'cause there was
9     a valid objection earlier that we were talking about
10    your old complaint. If you will turn to paragraph --
11    I'm sorry, page 11 at the very bottom of the page, the
12    last sentence of paragraph number 28 there it says:
13    Judd, subordinate officer, ordered Barreno to stop
14    moving. We clarified earlier that's a mistake, correct?
15        (Defendant's Exhibit Number 2 was marked for
16    identification.)
17        A.  Yes.
18        Q.  And you weren't ever told to do anything by any
19    of the deputies there. You weren't ever instructed or
20    ordered to do anything?
21        A.  No.
22        Q.  You weren't ever -- paragraph 29 demanded that
23    you show your driver's license or identification card?
24        A.  No.
25        Q.  You weren't ever told you had to submit to a
```

Page 42

```
1     data criminal warrant/background check?
2         A.  Nope.
3         Q.  How did you learn -- other than your attorneys,
4     how did you learn about the lawsuit -- sorry, that was
5     almost that bad question I asked earlier. And I don't
6     ever want to ask you about conversations you had with
7     your attorneys today or back then. But how did you
8     learn about the lawsuit other than through your
9     attorneys?
10        MR. LEPIERRE: I'm just trying to make sure I
11    understand that question. So I'm just going to
12    quickly object to attorney-client privilege grounds
13    and then instruct you not to say -- or not to
14    discuss any conversations you had with the law firm
15    or any of the attorneys through the law firm. Other
16    than that, you can answer the question.
17        A.  How did I -- you said how did I learn about the
18    lawsuit?
19    BY MR. CAMPBELL:
20        Q.  Yes, sir.
21        A.  We -- it was -- it was a conversation that was
22    between one of the -- I'm trying to remember what -- it
23    was a conversation between one of the management --
24        Q.  Was that Mr. Donovan?
25        A.  -- one of the management in the company.
```

Page 43

```
1         Q.  Was that Mr. Donovan?
2         A.  Yes.
3         Q.  You mentioned earlier that you also saw
4     newspaper articles about the lawsuit?
5         A.  Yes, but that was, I don't know, like, three
6     weeks later.
7         Q.  Okay. How did you come to see news articles
8     about the lawsuit three weeks later?
9         A.  Because we already had that conversation. I
10    didn't -- and let me explain why it was three weeks
11    later. 'Cause I actually went on vacation after Irma,
12    so I didn't have any contact while I was on vacation.
13        Q.  Okay. Was your conversation with Mr. Donovan
14    before or after you went on vacation?
15        A.  It was before I went on vacation.
16        Q.  And I -- let me show you what -- this is a -- I
17    don't expect that you've seen this, but this is a
18    supplemental response to a request to produce in this
19    particular case in which it's attached to some social
20    media blurbs and maybe some Facebook, which of course
21    that is social media but -- so and Twitter and some
22    Facebook -- you can tell how much I'm up on social
23    media. I don't think there are any actual news articles
24    here, which I have some of those, but I want ask you a
25    couple of questions about these if I can. Are you on
```

Page 44

```
1     this page right here, which I think are the Twitter --
2         A.  Is it the first page after the number two page?
3         Q.  Yes. Yes, it is.
4         A.  Okay.
5         Q.  The first one -- and I don't have these dated
6     on here. I think they are and I can't read it or else
7     they're not included on this one. But the first one
8     there on that Twitter account says: "We cannot and we
9     will not have innocent children in a shelter with sexual
10    offenders and predators, period." Do you remember if
11    you ever saw that Twitter [sic] at any time?
12        A.  I don't -- I don't -- not that, I don't know.
13    I'm 100 percent sure that I've never seen these comments
14    or Tweets or whatever. And the reason why is because I
15    don't have a Tweeter [sic] account. So I've never --
16    this is the first time I've actually seen this.
17        Q.  Okay. Good. So nobody showed you them either
18    that you recall?
19        A.  No.
20        Q.  Okay. On that first page have you had a chance
21    to review those?
22        A.  Yes.
23        Q.  Do you see anywhere in those where it says that
24    Sheriff Judd is going to have warrant checkpoints at
25    emergency shelters?
```

11 (Pages 41 to 44)

04229246-bd57-4b74-b67f-bb6a7a142fcd

Page 45

1    A. No, but I can't see the picture of what is --
2  who is that person. I -- I don't know. It just says
3  Polk County Sheriff.
4    Q. All right. I think that's probably a Polk
5  County -- that's probably a picture of our Sheriff Judd
6  in all likelihood, but I shouldn't say that. But in the
7  writing, do you see anywhere in there where it says that
8  Sheriff Judd has been tweeting that we're going to have
9  warrant checkpoints at emergency shelters?
10   A. No.
11   Q. The next page is --
12   A. As in he -- a question: I mean, isn't he in
13 charge? Isn't he supposed to check everything that goes
14 out if it's from Polk County?
15   Q. Yeah, but do you see anything on that page
16 where it says that we're going to do warrant checkpoints
17 at shelters?
18   A. Not -- not the sheriff.
19   Q. Do you see where it says anybody is?
20   A. No. It just comes from a Polk County sheriff
21 account.
22   Q. Right. And it says -- the first one says: "We
23 cannot have innocent children in the shelter with sexual
24 offenders and predators." Is that accurate?
25   A. Yes, sir.

Page 46

1    Q. And that doesn't say anything about doing
2  checkpoints for warrants, correct?
3    A. Correct.
4    Q. The next one says: "If you have a warrant,
5  turn yourself into the jail. It's a secure shelter."
6  Correct?
7    A. Correct.
8    Q. That doesn't say anything about doing warrant
9  checkpoints at emergency shelters, does it?
10   A. No.
11   Q. The next one says: "If you go to a shelter for
12 Irma and you have a warrant, we'll gladly escort you to
13 the safe and secure shelter called the Polk County
14 jail." Do you see that?
15   A. Yes.
16   Q. It doesn't say they're doing a warrant
17 checkpoint at emergency shelters, does it?
18   A. No.
19   Q. The next one says: "If you go to a shelter for
20 Irma, be advised sworn LEOs will be at every shelter
21 checking IDs, sex offender, predators will not be
22 allowed." Do you see that?
23   A. Yes. Can you specify what LEO is?
24   Q. That's law enforcement officer.
25   A. Okay.

Page 47

1    Q. So, "sworn law enforcement officers will be at
2  every shelter checking IDs. Sex offenders, predators
3  will not be allowed." Do you see that?
4    A. Yes.
5    Q. It doesn't say anything about doing warrant
6  checkpoints at emergency shelters?
7    A. No, sir.
8    Q. I'm going to give you second to review the
9  next, which I'm assuming these are Facebook but being
10 fairly ignorant on those. These next social media ones
11 are in a slightly different format. If I can get you to
12 spend some time -- and we'll go off the record for a
13 second -- and look through those and tell me if you find
14 anywhere in there where it's reported that warrant
15 checkpoints are going to occur at emergency shelters in
16 Polk County, okay.
17   A. Will do.
18     MR. CAMPBELL: And we're off the record.
19     (Off the record.)
20 BY MR. CAMPBELL:
21   Q. Mr. Barreno, have you had chance to review
22 those other social media posts that's attached to --
23 what we'll attach to this as Exhibit 3?
24     (Defendant's Exhibit Number 3 was marked for
25 identification.)

Page 48

1    A. Yes, sir.
2    Q. Did you find anywhere in there where it
3  reported that the sheriff was going to do warrant checks
4  at emergency shelters during Irma?
5    A. No.
6    Q. Other than Mr. Donovan, who else did you talk
7  to about what happened that day at the shelter with the
8  company other than lawyers?
9    A. Just him.
10   Q. I'm sorry?
11   A. Just him.
12   Q. How about Mr. Shipe?
13   A. No.
14   Q. And did you talk to him in person or by
15 phone -- Mr. Donovan?
16   A. It was a phone call.
17   Q. So was it before you went back to Virginia?
18   A. It was on -- I was driving up to Virginia, yes.
19   Q. So it would have been after the lawsuit was
20 actually filed assuming that date is correct and it was
21 filed on the Sunday before Irma hit Polk County?
22   A. I can't remember exact time. But, yes, it was
23 after -- after we did the shelter visit.
24   Q. And how many families was it -- or how many
25 clients was it that you were dealing with -- clients and

12 (Pages 45 to 48)

04229246-bd57-4b74-b67f-bb6a7a142fcd

Page 49

1  families in Polk County for this shelter — I mean, for
2  this shelter that day?
3      A.  I don't remember an exact number of people in
4  the family, but if I have to put a number I want to say
5  less than a dozen.
6      Q.  Was it one family?
7          MR. LEPIERRE:  Just make sure he finishes his
8  question before you talk, otherwise it's very hard
9  for the court reporter to do two things at once.
10         THE WITNESS:  Okay.
11  BY MR. CAMPBELL:
12     Q.  Less than a dozen?  Was it one family, one
13  client, and that client's family, or was it more than
14  one client?
15     A.  It was more than one client.
16     Q.  And other than the attempt there at Chain of
17  Lakes Elementary, did you attempt to get them in any
18  other shelter?
19     A.  The rest of group went around to other
20  shelters, but I'm not sure what was the outcome of that.
21  So me, personally, I just went to that shelter in Chain
22  of Lakes.
23     Q.  And then the people you were assisting then
24  went back to the resort with you and stayed there,
25  correct?

Page 50

1      A.  Yes.  We — yes.
2      Q.  So they didn't go to another shelter be it in
3  Polk County or any other county?
4      A.  No.
5      Q.  The front entrance, I'm trying to picture it,
6  and I'm not doing a good job.  And I'm sure it's me and
7  not you.  So was it a double-door entrance, or do you
8  recall?
9      A.  I don't know — I don't know if it was a double
10  door.  I remember I just opened one door and let Melissa
11  go in first and then I went, I followed.
12     Q.  Very chivalrous, good.  Good job.
13         And then were you in a hallway there or were
14  you in an actual office at that point, or do you recall
15  what did that look like when you first got in the —
16     A.  It was — it was a big room.  I can't remember
17  because there were — there were a lot of people there.
18  It was just a big room right when you went in and right
19  when you went in through the doors there was the desk on
20  the right side.
21     Q.  Okay.  So on the right side there was the desk
22  where the deputies were?
23     A.  Yes, sir.
24     Q.  What was on the left, if you went left?
25     A.  I don't remember.

Page 51

1      Q.  Okay.  Your driver's license at the time was a
2  Virginia license?
3      A.  Yes, sir.
4      Q.  So if you had provided your license, it would
5  have been a Virginia license there at that shelter?
6      A.  Correct.
7      Q.  Do you know if Virginia has sexual predators or
8  sexual offender markings, requirements on Virginia
9  licenses?
10     A.  I'm not sure.
11     Q.  You said that these deputies, from your
12  interaction with you, they treated you professionally?
13     A.  Yes.
14     Q.  Responded to your questions?
15     A.  Yes.
16     Q.  You think it's a good idea to have law
17  enforcement officers at shelters in emergencies such as
18  this?
19         MR. LEPIERRE:  Object on relevance and
20  competency to answer the question.
21     A.  I'm sorry, go ahead and repeat the question.
22  BY MR. CAMPBELL:
23     Q.  Do you think it's a good idea — subject to the
24  objection.  Do you think it's a good idea to have law
25  enforcement officers at emergency shelters like this in

Page 52

1  your experience?
2      A.  Yes.
3      Q.  And do you think it's a bad idea to check
4  driver's license for those entering the shelter?
5          MR. LEPIERRE:  Same objection; relevancy and
6  competency to answer.
7      A.  Repeat the question.
8  BY MR. CAMPBELL:
9      Q.  Do you think it's a bad idea for law
10  enforcement to check driver's licenses or other
11  identification, subject to the objection, in an
12  emergency shelter such as Chain of Lakes?
13     A.  I'm -- I'm not sure.
14     Q.  It was not good for your clients because they
15  didn't want to have to go through that, correct?
16     A.  Correct.
17     Q.  Any other reason you think it's a bad idea,
18  subject to that objection, to check driver's licenses at
19  emergency shelters?
20     A.  No.
21         MR. CAMPBELL:  Anybody want a break?
22         MR. ARANDES:  Yeah.
23         MR. CAMPBELL:  We're going to take one more
24  short break.  That means I'm through, but I probably
25  have forgotten something.

13  (Pages 49 to 52)

04229246-bd57-4b74-b67f-bb6a7a142fcd

Page 53

1    (Off the record.)
2    MR. CAMPBELL:  I have no further questions.
3    Thank you very much, sir.  Thank you for being here.
4    THE WITNESS:  Thank you for your time.
5    MR. LEPIERRE:  I do have a few more questions
6    for you.  I'm sorry, we'll get you to your food as
7    soon as we can -- all of us.
8              CROSS-EXAMINATION
9    BY MR. LEPIERRE:
10   Q.  I'm going to take this in reverse order.  So
11   earlier, Mr. Campbell showed you some social media --
12   I'm going to try and get it right because it's a big
13   one, some tweets from the Polk County Sheriff?
14   A.  Yes.
15   Q.  If you can look back at that page, and if you
16   could look at the second one down and read that to me.
17   A.  "If you have a warrant, turn yourself in to the
18   jail.  It's a secure shelter."
19   Q.  And then if you could read the one underneath
20   that for me?
21   A.  "If you go to a shelter for Irma and you have a
22   warrant, we'll gladly escort you to the safe and secure
23   shelter called the Polk County jail."
24   Q.  Reading those would that give you the
25   impression that they would be looking for warrants on

Page 54

1    anyone one who entered a shelter?
2    A.  Yes.
3    Q.  Looking one more to the next page.
4    A.  Especially if you translate that into Spanish.
5    Q.  Can you explain that to me?
6    A.  So if you translate or you put this in Spanish,
7    it's -- it will scare our clients off, you know, Spanish
8    speakers.  It's just in English you say it one way, in
9    Spanish it completely says it differently.  If the
10   person has the perception of that in Spanish, it's like,
11   okay, I don't want to go through that.
12   Q.  Okay.  Looking to that next page, looking at
13   the third paragraph down, can you read the first
14   sentence of that?
15   A.  You said third paragraph?
16   Q.  Yes.
17   A.  "If you have a warrant and you show up to a
18   shelter, you will be taken to a very secure shelter
19   called the Polk County jail."
20   Q.  And would that also give you the impression
21   that they would be looking for warrants if you show up
22   in a Polk County shelter?
23   A.  Of course, yes.
24   Q.  And earlier when you were speaking about the
25   conversation you had with the sheriff's deputy at the

Page 55

1    shelter that you went to, were you speaking from exact
2    quotes of what you said or what you remembered of what
3    she said?
4    A.  What I remembered, you know, the -- the --
5    Q.  And I believe you said that she said you need
6    an ID, correct?
7    A.  Correct.
8    Q.  Or if you didn't have an ID, that you'd need to
9    provide your name, birth date -- or full name and birth
10   date, correct?
11   A.  Yes.
12   Q.  And then she also said that if you did not
13   provide the name and birth date, they would take a
14   fingerprint; is that correct?
15   A.  Correct.
16   Q.  And then after that you said that while they
17   weren't looking for anything specific, if you had a
18   warrant, a felony, or other child abuse charges they
19   would find that or they would need to do something?
20   MR. CAMPBELL:  Object to form.
21   MR. LEPIERRE:  I'm sorry, let me -- let me -- I
22   even got lost halfway through that.  I apologize.
23   BY MR. LEPIERRE:
24   Q.  Let me rephrase that question.  I believe you
25   said that if you had any -- they weren't looking for

Page 56

1    anything specific, but if you had any felonies -- or any
2    warrants, felonies, or other child abuse charges, they
3    would act upon that; is that correct?
4    A.  Yes.
5    Q.  Did you take that to mean that if you had any
6    of those things after they ran your ID or they took your
7    ID, that they would have to do something about it?
8    MR. CAMPBELL:  Object to the form.
9    A.  Yes.
10   BY MR. LEPIERRE:
11   Q.  And did you take it to mean that if provided to
12   them a name and birth date, that they would put that
13   into their computer system somehow?
14   A.  Yes.
15   Q.  And did you take it to mean that if they found
16   you had a felony warrant or a child abuse charge they
17   would do something about that?
18   A.  Yes.
19   Q.  And then again, when they took -- if you
20   provided fingerprints, you take it that they would enter
21   that into their system somehow?
22   A.  Yes.
23   Q.  And then again, if they found a felony or a
24   warrant or a child abuse charge, they would have done
25   something about that as well?

14  (Pages 53 to 56)

04229246-bd57-4b74-b67f-bb6a7a142fcd

Page 57

1    A. Correct.
2    Q. When you first decided you were going to go in
3 there and ask some questions, I believe you said it was
4 because your clients had mentioned to you that they were
5 under the impression that they were checking IDs and
6 things of that nature; is that correct?
7    A. Not to me specifically but when they called the
8 1-800 number for the company.
9    Q. Okay. So that's how you became aware of that
10 concern?
11    A. Correct.
12    Q. And can you explain a little bit why that would
13 be a concern for your clients?
14    A. Our clients most -- or the majority of them
15 don't have legal status in the United States, so they're
16 undocumented immigrants that are in the process of
17 immigration. It's -- it's a long process and, you know,
18 until that process is done, you know, one of two things
19 happen, either they get to stay in the United States,
20 which they get provided a Social Security card, a green
21 card, an ID, what have you. But if you don't, then --
22 then you get deported. And that's why our clients are
23 scared to have even some type of contact with law
24 enforcement.
25    Q. Okay. And I believe you said earlier something

Page 58

1 about detention. Can you explain what that would be or
2 how they would have been in detention before they were
3 your clients?
4    A. Repeat the question.
5    Q. So you said before they were concerned about
6 going back to detention -- I kind of made a logical leap
7 there. But you said they were afraid of going back to
8 detention. Could you explain when they would have been
9 in detention?
10    A. So when they either got in contact with either
11 an ICE officer or a police officer some of the times,
12 they can't get identified, they get put into county
13 jails or -- or detention in counties or cities. And
14 once that happens, if they cannot identify them, ICE,
15 which is immigration, puts a hold on the them. So the
16 county cannot release them until ICE comes and picks
17 them up to identify them.
18    Q. Circle back to a long time ago it seems like.
19 Originally you said you were in Florida a week and a
20 half, two weeks before Irma. Can you tell me where you
21 were again, sorry?
22    A. I -- I was working South Florida, but when I
23 got the phone call I was in Miami.
24    Q. Okay. And then how did you learn about the
25 situation related to Irma?

Page 59

1    A. At first we were told there was a storm. My
2 boss said, "Hey, Andres, you should start thinking on
3 wrapping things up and come north." The same day there
4 was a message from management saying who wanted to
5 volunteer to help out clients with, you know, food and
6 -- and relocating them, transportation or -- the message
7 went through. I volunteered, you know. I mean, at the
8 end of the day, my job is to help as much as I can. So
9 I volunteered. My boss called me, asked me where I'm
10 at, and we made the appropriate decisions to start
11 getting things together so we can drive up and see
12 what -- what we could do before the rest of people came
13 down from Verona. So pretty much I was the first one in
14 the state before everything started.
15    Q. Okay. And then you said earlier you were part
16 of an emergency team. Would that emergency team have
17 been made of those volunteers you just mentioned?
18    A. Yes.
19    Q. And what was the purpose of that emergency
20 team?
21    A. To provide aid to our clients. We literally
22 came to provide aid for our clients. But along the way,
23 we ended up helping more families that weren't in our
24 program or clients.
25    Q. And then when you went into the shelter after

Page 60

1 your clients' concerns, did you -- or before, I'm sorry,
2 you went into the shelter for client concerns, did you
3 intend to stay in a shelter?
4    A. Yes.
5    Q. Did your clients express interest in staying in
6 a shelter too?
7    A. Yes.
8    Q. When -- obviously you discovered what was going
9 on and your clients made the decision not to remain in a
10 shelter, what was your choice at that point?
11    A. Immediately came to the decision and talked to
12 the group and let them know that we can't have them go
13 through all that. And in the decision -- why I made the
14 decision is because I've -- I've been in their
15 situation. My family has been in that situation. I've
16 been in that situation myself. So I spoke to the people
17 in charge and I said, Look, we can't have -- put them in
18 that risk and have them go through the whole process
19 again. You know, it's just a lot of painful time [sic].
20 A lot of -- a lot of money involved in all this. So,
21 yeah, I made the decision right there and then. I said
22 as a senior RM, risk manager, you know, we -- we can't
23 do that.
24    Q. And would you have felt safer within the
25 shelter?

15  (Pages 57 to 60)

Wasilewski Court Reporting
(888) 686-9890

04229246-bd67-4b74-b67f-bb6a7a142fcd

Page 61

1      A.  Of course, yes.
2          MR. LEPIERRE:  No further questions.
3              REDIRECT EXAMINATION
4    BY MR. CAMPBELL:
5      Q.  Why not take them to Osceola County shelters?
6      A.  I was just in charge of my region with what
7    they gave me -- what Tim Shipe, he -- he spread out, you
8    know, the areas, the regions to each person and I was in
9    charge of that part of -- of the state I guess, or the
10   city, you know.  He said, Look, try to get as much
11   information as you can so we can help these people try
12   to get shelter closest to their home so they don't have
13   to carry all their stuff for such a long time, you know,
14   for transportation.
15     Q.  You took them to a resort near Kissimmee,
16   correct, where you were staying?
17     A.  Yes.
18     Q.  Did you know that was Osceola County?
19     A.  No.
20     Q.  Why not use any of the Osceola County shelters
21   that were open?
22     A.  I'm sure there was -- there were other members
23   of the emergency team that checked, but I'm not sure
24   what was the outcome of that because it was only our
25   families that went to the resort with us.

Page 62

1      Q.  Is it correct that you decided to send the
2    families to Osceola County after going to Chain of Lakes
3    School?
4      A.  Repeat the question.
5      Q.  Is it is correct that you decided to send the
6    families to Osceola County after you went to Chain of
7    Lakes School?
8      A.  It was -- it was my opinion within the group to
9    send them to a different location.
10     Q.  So why not an emergency shelter in Osceola
11   County?  If you would have felt safer there, they would
12   have felt safer there than at the resort there, why not
13   to an emergency shelter in Osceola County?
14     A.  I'm not sure why the group did not do the
15   Osceola County.  I'm not sure what was the outcome of
16   that.  All we knew was that most of the shelters were
17   already 80 percent, 75 percent full and by the time we
18   would have gotten there, we wouldn't have space for
19   them.
20         So like I said, I was responsible for my
21   families in Polk County.  I was not able to stay in a
22   shelter in Polk County so that's why we removed them
23   from -- from that area.
24     Q.  Did any of your clients have warrants?
25     A.  Not that I know of.

Page 63

1      Q.  What is your -- what is a warrant?
2      A.  When -- when you made an offense and you're
3    wanted by some type of government entity.
4      Q.  A judicial entity has entered a warrant for
5    someone's arrest or whatever it is, correct?
6      A.  Yes.
7      Q.  What is law enforcement supposed to do if they
8    discover someone with a warrant?
9          MR. LEPIERRE:  Objection on qualification to
10   answer that question.
11   BY MR. CAMPBELL:
12     Q.  If you have any idea, what is law enforcement
13   supposed to do if they find out there's a warrant for
14   someone's arrest?
15         MR. LEPIERRE:  Same objection.
16     A.  They need to act upon it.
17     Q.  You said that especially in Spanish -- and I'm
18   not disputing that at all.  And -- oh, we're back -- I
19   think this is Exhibit 3, and we're back to that front
20   page now.
21         You said that third tweet there:  "If you go to
22   a shelter for Irma and you have a warrant, we'll gladly
23   escort you to the safe and secure shelter called the
24   Polk County jail."  That tells you or at least gives you
25   the impression that they're looking for warrants.  Where

Page 64

1    is that in there?  Let's start with English first.
2    Where is that in that?
3      A.  That it's looking for warrants?
4      Q.  Yes.
5      A.  It doesn't say specifically there.
6      Q.  But it's giving you that impression.  What
7    about that is giving you that impression?
8      A.  I mean, if you have warrant, you know, they
9    will escort you to -- to jail.
10     Q.  Right.  What about that says we're checking for
11   warrants at shelters?
12     A.  It does not say specifically that they're
13   checking for --
14     Q.  I think you said the one before it says that
15   too.  "If you have a warrant, turn yourself into the
16   jail, it's a secure shelter."  What about that gives the
17   impression that we're checking for warrants when we're
18   actually saying "turn yourself into the jail"?
19     A.  I mean, I guess any -- if I'm an undocumented,
20   I'm on the mentality that I came in to the United States
21   wrongfully.  Like, I came illegally so that puts me in a
22   negative.  So if I put myself in that situation as an
23   illegal immigrant, I'm already under a process with the
24   court.  So I guess in -- in their minds they're already
25   in a process in court.

16  (Pages 61 to 64)

Wasilewski Court Reporting
(888)  686-9890

04229246-bd57-4b74-b67f-bb6a7a142fcd

Page 65

1    Q.  Well, you think they think that if they're
2  undocumented, that they have a warrant issued for their
3  arrest?
4    A.  I don't know --
5    MR. LEPIERRE:  Object; asking for an opinion
6  outside of his knowledge.
7  BY MR. CAMPBELL:
8    Q.  Okay.  You can answer, if you can.
9    A.  I don't think they think.  I know they feel
10  that way.
11    Q.  You think they don't understand what a warrant
12  is?
13    A.  A lot of -- a lot of the illegal immigrants,
14  they don't know even how to read and write.  You know,
15  so, yes, sometimes they can misinterpret that and as
16  soon as they read warrant, jail -- warrant, jail, escort
17  automatically a person that does not -- that barely
18  knows how to read or write says, you know, I'm not even
19  going to try this.
20    Q.  That first tweet up there.  "We cannot and will
21  not have innocent children in a shelter with sexual
22  offenders and predators, period."  Do you agree with
23  that?
24    A.  Yes.
25    Q.  That last one:  "If you go to a shelter for

Page 66

1  Irma, be advised sworn LEOs will be at every shelter
2  checking IDs.  Sex offenders, predators will not be
3  allowed."  Do you agree with that too?
4    A.  Yes.
5    Q.  The third to the last page here on this one,
6  and it looks like this at the top (indicating).  We on
7  the same page?
8    A.  Yes.
9    Q.  The second paragraph there is a parenthetical
10  with a PS.  Can I get you to read that and then I'll ask
11  you a question about it.
12    A.  "Just by the rumors --
13    Q.  You don't have to do it out loud.
14    A.  Oh, I'm sorry.
15    Q.  You can read it to yourself.
16    A.  Sorry.
17    Q.  No, I did say that.  Again, that's a bad
18  question, but --
19    Were you ever made aware of that social media
20  publication by the Polk County Sheriff's office?
21    A.  No.
22    Q.  Would that have satisfied your client -- or
23  your clients and their families?
24    A.  Somewhat, yes.
25    Q.  It's dated September 10th on there.

Page 67

1  Unfortunately, it's the day after you apparently went to
2  the shelter.  Do you know if anyone tried to -- other
3  than your contact with the deputies at Chain of Lakes
4  Elementary School, do you know if anyone tried to
5  contact anyone with the sheriff's office to try to
6  clarify?
7    A.  No.
8    Q.  I understood your testimony to be that if you
9  had to be fingerprinted, the deputy told you then
10  they're not looking for anything specific.  But if a
11  person has warrants or prior felonies or child abuse
12  felonies, then they would have to act upon that; is that
13  accurate?
14    A.  Yes.
15    Q.  That didn't have anything to do with the ID
16  portion of what they told you, correct?
17    A.  Can you explain?
18    Q.  Yes.  I -- I understood as you walked through
19  progression that you were told by the deputy that you
20  needed to have an ID so they know who's coming into the
21  shelter and it needs to be government issued, correct?
22    A.  Yes.
23    Q.  I don't see anything in there about running
24  warrants or prior felonies or child abuse felonies as to
25  the ID.  Did you understand that at the time?

Page 68

1    A.  At the time, no.
2    Q.  Do you know what program they were using to run
3  the IDs?
4    A.  No.
5    Q.  Do you know that there are public websites with
6  FDLE and others for running IDs on persons?
7    A.  No.
8    Q.  And that they don't bring up warrants or
9  anything like that when you run them?
10    A.  No, I wasn't aware of that.
11    Q.  And you weren't aware of what program the
12  sheriff's office was using to check IDs?
13    A.  No.
14    Q.  And then the next question was:  They would
15  give their full name and date of birth.  Again, nothing
16  about giving the full name and date of birth that
17  necessarily implies that they're going to be looking for
18  warrants or prior felonies or child abuse felonies, is
19  there?
20    A.  No, not -- not for a U.S. citizen or a
21  permanent resident.
22    Q.  What about for your clients?  What would have
23  been different about them?
24    A.  As soon as they -- they cannot be -- they can't
25  get identified.  They will get -- they will get

17  (Pages 65 to 68)

04229246-bd57-4b74-b67f-bb6a7a142fcd

Page 69

1  detained.
2      Q.  So your idea is if they give their full name
3  and date of birth and it doesn't come up in the system,
4  that they'll then be detained at an emergency shelter?
5      A.  As far as I know, and what our clients go
6  through, is that if they cannot get identified somehow
7  with a system in the state, they will get detained so
8  that they can get identified.  And if they cannot get
9  identified, they will put an ICE hold so immigration can
10 come and pick them up.
11     Q.  If they're not suspected of having comitted a
12 crime or anything?
13     A.  No.
14     Q.  If they can't identify themselves in the
15 system, your understanding is they get detained for ICE?
16     A.  They will -- they will get questioned and if
17 they can't identify them, they will detain them until
18 they get identified.
19     Q.  Do you tell your clients that?
20     A.  We have a lot of clients that have been stopped
21 in the middle of the street just to ask for their names
22 and if they can't get an ID or they can't prove that
23 they're the person they're saying, they get detained and
24 they go through our process again.  The bail, the
25 deposit and all that.  So, yes, it has happened and

Page 70

1  that's the experience where amongst the community they
2  talk about.  So the best thing is don't come across a
3  police officer or -- or law enforcement because they
4  know they can't provide an ID.
5      Q.  Have you ever heard of that happening in Polk
6  County by the Polk County Sheriff's Department than they
7  stop someone in the street without any probable cause
8  for anything, ask their name, and if they can't prove
9  who they are, they detain them?
10     A.  No, sir.
11     MR. CAMPBELL:  Let me take one more break.
12     (Off the record.)
13 BY MR. CAMPBELL:
14     Q.  I do have one more.  Back to that PS quote I
15 had there: "Despite the rumors and fake news, anything
16 else you may have seen on the Internet, we are not
17 concerned with residency status or immigration.  We are
18 not turning away anyone who doesn't have an ID.  Every
19 shelter has a check-in log for accountability.  If you
20 don't have an ID, you will still be allowed to check-in.
21 Our mission is to keep everyone safe."  Did you have any
22 conversation with the deputy at the scene about that,
23 what would happen if we don't have an ID, would we still
24 be allowed to check-in?
25     A.  No.

Page 71

1      MR. CAMPBELL:  Okay.  That's all I have really.
2  Thank you very much again.
3      MR. LEPIERRE:  Just one quick redirect on that
4  one.
5      MR. CAMPBELL:  Sure.
6          RECROSS-EXAMINATION
7  BY MR. LEPIERRE:
8      Q.  Do you know what the date on that is?
9      A.  September 10th, 2017.
10     Q.  And when you spoke with the deputy at the
11 shelter, did she give you a hierarchy of things they
12 would require like a list of things that you would have
13 to produce?
14     A.  No.
15     Q.  Did she tell you you'd have to produce some
16 kind of government ID?
17     A.  Correct, yes.
18     Q.  Did she give you an alternative if you couldn't
19 produce an ID that you could give them?
20     A.  What I -- what I asked was, another country's
21 passport?  And that's when she said it has to be a
22 government issued ID.
23     Q.  And if you couldn't produce that, what'd you
24 say you have to produce?
25     A.  That you needed to identify yourself either

Page 72

1  way.  So a name, and a full name, and date of birth.
2  And if the person didn't want to provide that, then they
3  would do a fingerprint check.
4      Q.  Did it give you any option where you didn't
5  have to provide any of those to enter the shelter?
6      A.  No.
7      MR. LEPIERRE:  That's all I have.
8      MR. CAMPBELL:  Thank you very much.
9      THE WITNESS:  Thank you.
10     MR. CAMPBELL:  Does he want to read or waive?
11     MR. LEPIERRE:  We're going to read.
12     MR. CAMPBELL:  Good.  And I will order it.
13     THE COURT REPORTER:  Okay.
14     MR. CAMPBELL:  And thank you again, too.
15     THE WITNESS:  Thank you.
16     MR. LEPIERRE:  We'll order it, too.
17     THE COURT REPORTER:  Okay.  Thank you.
18     THEREUPON, the Deposition of ANDRES BARRENO,
19 taken at the instance of the Defendant, was
20 concluded at 4:27 p.m.
21
22
23
24
25

18  (Pages 69 to 72)

04229246-bd57-4b74-b67f-bb6a7a142fcd



Page 73

CERTIFICATE OF REPORTER OATH

STATE OF FLORIDA

COUNTY OF POLK

1     I, Danette V. Lamb, Stenographic Shorthand
2  Reporter, and Notary Public in and for the State of
3  Florida at large, hereby certify that the witness named
4  herein appeared before me on March 12, 2019, and was
5  duly sworn.

6     WITNESS my hand and official seal this December
7  19, 2018.

Danette V. Lamb
NOTARY PUBLIC - STATE OF FLORIDA
MY COMMISSION NO. FF935860
EXPIRES:  January 26, 2020

Page 74

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF ORANGE

     I, Danette V. Lamb, Stenographic Shorthand
Reporter, and Notary Public in and for the state of
Florida at large, do hereby certify that I was
authorized to and did stenographically report the
examination of the witness named herein; that a review
of the transcript was requested; and that the foregoing
transcript is a true record of my stenographic notes.

     I FURTHER CERTIFY that I am not a relative,
employee, or attorney, or counsel for any of the
parties, nor am I a relative or employee of any of the
parties' attorney or counsel connected with the action,
nor am I financially interested in the outcome of this
action.

     DATED THIS 27th day of March, 2019, at Orlando,
Orange County, Florida.

Danette V. Lamb
Stenographic Shorthand Reporter

Page 75

Libre By Nexus, Andres Barreno vs. Sheriff Grady Judd,
Polk County Sheriff's Office

IN RE:  DEPOSITION OF ANDRES BARRENO
TAKEN:  MARCH 12, 2019
TO:  ANDRES BARRENO
     1530 Copperfield Avenue
     Deltona, Florida 32738
     The referenced transcript has been completed
and has been delivered to you for your review and
signing of the errata sheet.
     Today's date is March 27, 2019.  Please
complete the reading and signing by _____.

     Please return the transcript and signed errata
sheet to Wasilewski Court Reporting, 2005 South Florida
Avenue, Lakeland, Florida 33803.

     The original transcript of this deposition has
been delivered to Hank Campbell, Esquire, and your
errata sheet, once received, will be forwarded to all
ordering parties as listed below.
     Thank you.

_____
Emma Voithofer, Production Department

cc: Hank Campbell, Esquire
    Dallas LePierre, Esquire

Page 76

ERRATA SHEET
DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES ON THIS PAGE
IN RE:  LIBRE BY NEXUS VS. SHERIFF GRADY JUDD, POLK
                 COUNTY SHERIFF'S OFFICE
CASE NO.:  8:18-cv-970-T-35SPF
DEPOSITION OF ANDRES BARRENO
TAKEN:  March 12, 2019
PAGE #/LINE #    CHANGE              REASON

Under penalties of perjury, I declare that I have read
the foregoing document and that the facts stated in it
are true.

_____
ANDRES BARRENO         DATE
cc: Hank Campbell, Esquire
    Dallas LePierre, Esquire

19  (Pages 73 to 76)

04229246-bd57-4b74-b67f-bb6a7a142fcd

Filing # 61469032 E-Filed 09/10/2017 04:39:45 PM

IN THE CIRCUIT COURT OF THE 10TH JUDICIAL CIRCUIT
IN AND FOR POLK COUNTY, FLORIDA

COPY

| | |
|---|---|
| LIBRE BY NEXUS, ) | |
| NEXUS SERVICES, INC. ) | Case No. 2017CA - 003170 |
| and ) | |
| ANDRES BORRENO, ) | |
|     Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| SHERIFF GRADY JUDD, in his official ) capacity as Sheriff of Polk County, ) Florida, a/k/a POLK COUNTY ) SHERIFF'S OFFICE and in his ) individual capacity; and POLK ) COUNTY, FLORIDA (a charter county ) and political subdivision within the ) State of Florida), ) | JURY TRIAL DEMANDED |
| ) | |
|     Defendants. ) | |

## COMPLAINT

Plaintiffs, through their undersigned attorney, file this Complaint against

Defendants, SHERIFF GRADY JUDD, in his official capacity as Sheriff of Polk County,

Florida, a/k/a POLK COUNTY SHERIFF'S OFFICE and in his individual capacity; and

POLK COUNTY, FLORIDA (a charter county and political subdivision within the State

of Florida), all of whom have misused emergency shelters as unlawful pedestrian

checkpoints to conduct suspicionless warrant/criminal background checks on

human beings desperate for shelter to save their lives in face of the worst

Δ's EXHIBIT
A . BARRENO
#1
3/12/19          DDC

2017CA-003170-0000-00      Received in Polk 09/12/2017 03:55 PM

hurricane in modern times. Plaintiffs use 42 U.S.C. § 1983 as the vehicle to vindicate the constitutional right to be free from unreasonable searches and seizures at an unlawful pedestrian checkpoint. In support of this Complaint, Plaintiffs allege:

## INTRODUCTION

### 1.

During a crisis situation in which thousands of Florida residents seek shelter from the worst hurricane in modern times, Sheriff Grady Judd decided to misuse all emergency shelters in his jurisdiction as pedestrian checkpoints to detect ordinary criminal wrongdoing. He boasted on Twitter: "If you have a warrant, turn yourself in to the jail—it's a secure shelter," and, "If you go to a shelter for Irma and you have a warrant, we'll gladly escort you to a safe and secure shelter called Polk County Jail." His spokesperson added, "We hope it [people seeking emergency shelter] actually leads to more people turning themselves in." Indeed, Judd— the individual who sets policy for Polk County— has made it quite clear that he and his subordinate officers/deputies are simply trying to "detect evidence of ordinary criminal wrong doing," at the entrance doors of shelters being used to save human lives. *See City of Indianapolis v. Edmond*, 531 U.S. 32, 37-48 (2000). All statements to the contrary made by Judd are belied by the facts, and the Law.

2

2017CA-003170-0000-00   Received in Polk 09/12/2017 03:55 PM

**2.**

Judd's statement that his conduct is aimed toward sexual predators is nothing more than a guise for undertaking unconstitutional searches and seizures. First, the state of Florida requires each person who has been designated a sexual predator/offender who has a driver's license/Identification card to have on that card — in big bold letters — that said person is a sexual predator/offender:

> It is unlawful for any person designated as a sexual predator or sexual offender to have in his or her possession a driver license or identification card upon which the sexual predator or sexual offender markings required by s. 322.141 [Color or markings of certain licenses or identification cards] are not displayed or have been altered.

§ 322.212(5)(c), Fla. Stat.

**3.**

Florida law further ensures that the licenses and identification cards of sexual predators/offenders contain clear markings, by mandating the following:

> (3) All licenses for the operation of motor vehicles or identification cards originally issued or reissued by the department to persons who are designated as sexual predators under s. 775.21 or subject to registration as sexual offenders under s. 943.0435 or s. 944.607, or who have a similar designation or are subject to a similar registration under the laws of another jurisdiction, shall have on the front of the license or identification card the following:
>
> (a) For a person designated as a sexual predator under s. 775.21 [The Florida Sexual Predator Act] or who has a similar

3

designation under the laws of another jurisdiction, the marking "SEXUAL PREDATOR."

(b) For a person subject to registration as a sexual offender under s. 943.0435 [Sexual offenders required to register with the department; penalty] or s. 944.607 [Notification to Department of Law Enforcement of information on sexual offenders], or subject to a similar registration under the laws of another jurisdiction, the marking "943.0435, F.S."

(4) Unless previously secured or updated, each sexual offender and sexual predator shall report to the department during the month of his or her reregistration as required under s. 775.21(8), s. 943.0435(14), or s. 944.607(13) in order to obtain an updated or renewed driver license or identification card as required by subsection (3).

§ 322.141, Fla. Stat.

All the above means that Sheriff Judd does not have to run a warrant check or criminal background check to determine if someone is a sexual predator/offender because all he has to do is check each person's license/ID card and deal accordingly with those persons designated as sexual predators/offenders.

4.

Sheriff Judd's true motives are clear, and have been expressed by him explicitly: The purpose of these pedestrian "checkpoints" is to conduct a fishing expedition to find any possible basis, no matter how tenuous, for issuing citations to or arresting human beings seeking refuge from a Class 5 hurricane. The problem is that these searches and seizure are not based on any suspicion of

4

criminal conduct. Suspicion is not raised by trying to gain entry into an emergency shelter to save one's life and the lives of family members.

5.

Judd's policy is classic protectionism against "outsiders" entering his county, and he uses the greatest natural disaster in modern times to execute it.

## PARTIES

6.

At all times relevant to this Complaint, Mr. Borreno was a citizen of the United States and a resident of Virginia. Mr. Borreno, at all times relevant to this Complaint, had clearly established legal rights under state and federal law and the U.S. Constitution. Mr. Borreno submits himself to the jurisdiction and venue of this Court and is entitled to bring this action under state and federal law for all general, special, compensatory, punitive, and any other permissible damages.

7.

At all times relevant, Libre by Nexus has been a for profit corporation that has, as one of its missions, the stabilization of court appearances for immigrants facing deportation and having active cases before the Executive Office of Immigration Review (EOIR) courts. Through its secure GPS and monitoring/support program, Libre by Nexus has increased court appearance by

5

2017CA-003170-0000-00      Received in Polk 09/12/2017 03:55 PM

immigrants in removal proceedings (and released from detention centers) from an estimated 35% to nearly 99% appearance rate, and has secured the release of over 15,000 immigrants from federal custody so that they can be home with their families, saving US taxpayers in excess of $600,000,000. Libre by Nexus clients receive support and services from the organization.

8.

Nexus Services, Inc funds our nations' largest pro bono immigrant legal services law firm (Nexus Caridades Attorneys, Inc), and that law firm focuses on pro bono services to immigrants regarding deportation and asylum cases, inter alia. Nexus Services has funded cases for numerous immigrants that reside in Florida and who are currently looking for shelter. Nexus Services, at the time of this filing, has a full investigation and emergency response team in Florida, helping numerous immigrants find shelter. Nexus Service has, as one of its missions, specifically funding organizations which ensure that the constitutional rights of criminal defendants and immigrants are not violated.

9.

At all times relevant to this Complaint, Defendant Judd was a United States citizen, a Florida resident, a sworn Sheriff of the Polk County Sheriff's Office. At all relevant times to this Complaint, Defendant Judd was acting under the color of state law. At all relevant times, Defendant Judd was subject to the laws of the Florida and the Constitution of the United States. At all relevant

6

times, Judd was responsible for knowing and acting in accordance with all policies, procedures, orders, special orders, general orders, guidelines and regulations of the Polk County Sheriff's Office. And at all relevant times, Judd was the policy maker—on behalf of Polk County—for all matters related to warrant checks and criminal background checks conducted by Judd and law enforcement officers under his command and control. Mr. Borreno is using 42 U.S.C § 1983 as the vehicle to sue Judd in his individual and official capacities regarding federal claims.

## JURISDICTION AND VENUE

10.

This Court has original subject matter jurisdiction over the federal claim in this action in accordance with 28 U.S.C. § 1331 because the claim raises a federal question under the laws and Constitution of the United States.

11.

This Court has supplemental subject matter jurisdiction over the state claim in this action under 28 U.S.C. § 1367(a) because the state and federal claims form part of the same case or controversy under Article III of the United States Constitution.

12.

This Court has personal jurisdiction over the Defendants who are located in, or who are, Polk County, Florida.

7

13.

Venue is proper herein because Defendants reside in, or are, Polk County, and a substantial part of the events giving rise to the claims occurred in this district.

## STATEMENT OF FACTS

A.    The worst Hurricane, natural disaster in modern time

14.

In 2017, Hurricane Irma was called one of the strongest storms in recorded history and the strongest ever recorded in the Atlantic Ocean, with a peak intensity of 185 mph, exceeding the likes of Katrina, Andrew and Camille. *See Extreme Category 5 Irma crashes into Caribbean, sets sights on Florida and Southeast U.S.*, WASH. POST (Sept. 6, 2017), https://www.washingtonpost.com/news/capital-weather-gang/wp/2017/09/06/extreme-category-5-irma-crashes-into-caribbean-sets-sights-on-florida-and-southeast-u-s/.

15.

Hurricane Irma maintained maximum wind speeds of at least 185 mph longer than any other storm in recorded history *on Earth. Id.*

16.

The storm generated the most Accumulated Cyclone Energy, a measure of both a storm's duration and intensity, of any hurricane on record. Late Tuesday night, September 5, 2017, the storm's pressure dropped to 914 millibars (the

8

lower the pressure, the stronger the storm), ranking as the lowest of any storm on record outside the Caribbean and Gulf of Mexico in the Atlantic basin. *Id.*

17.

On September 6, 2017, *The Washington Post* reported: "This is a life-threatening storm that the Hurricane Center warns is capable of catastrophic damage. Preparations should be rushed to completion along and near its projected path, including over South Florida." *Id.*

18.

Forecasters warned that Irma's hurricane-force winds were so wide they could reach from coast to coast in Florida, testing the nation's third-largest state.[1]

19.

"This is a storm that will kill you if you don't get out of the way," National Hurricane Center meteorologist Dennis Feltgen said. "Everybody's going to feel this one." *Id.*

20.

"Irma killed at least 20 people in the Caribbean and left thousands homeless as it devastated small resort islands." *Id.*

---

[1] Curt Anderson and Claire Galofaro, *Irma bears down on Florida; more than 5M told to flee coast*, ABC NEWS (Sept., 2017, 11:28 PM), http://abcnews.go.com/US/wireStory/hurricane-warnings-add-urgency-florida-evacuations-49696526.

9

21.

"Irma trained its sights on Florida and officials warned more than 5 million people that time was running out and ordered them to evacuate ahead of the deadly hurricane as it followed a path that could take it from one end of the state to the other." *Id.*

22.

In one of the largest evacuations in the history of the United States, about 5.6 million people in Florida — *more than one-quarter of the state's population* — were ordered to evacuate and another 540,000 were told to leave the Georgia coast. *Id.*

23.

Authorities opened hundreds of shelters for people who did not leave. Hotels as far away as Atlanta filled up with evacuees. *Id.*

B.  **Defendants implement checkpoint program to detect ordinary, arrestable crimes**

24.

As other counties opened storm shelters and coordinated with privately operated homeless shelters and other facilities to welcome the millions of people seeking refuge from the powerful storm, Polk County Sheriff Judd decided to turn the evacuation into an opportunity trap evacuees who had warrants for any

10

offense and take them to jail, or otherwise deter shelter-seeking evacuees if they had warrants for any offense.

### 25.

On Tuesday morning, September 6 2017, from the Polk County Sheriff official Twitter account, Sheriff Judd tweeted: "If you go to a shelter for #Irma and you have a warrant, we'll gladly escort you to the safe and secure shelter called Polk County Jail" (see below).



### 26.

A spokesman for Sheriff Judd said, "We hope it [the emergency evacuation] actually leads to more people turning themselves in."

### 27.

The purpose of these pedestrian "checkpoints" is to conduct a fishing expedition to find any possible basis, no matter how tenuous, for issuing citations to or arresting human beings seeking refuge from a Class 5 hurricane.

11

about:blank                                                                                          4/2/2019

28.

Judd ordered his deputies and other officers to go to the emergency shelters for evacuees from Hurricane Irma to set up and enforce the checkpoints.

29.

Pursuant to Judd's orders, at each checkpoint at the entry way of the emergency shelters, when a person seeking entry to a shelter approaches the shelter, Judd's deputies and subordinate officers order the person to stop moving.

On September 9, 2017 as Borreno tried to enter the shelter, Judd's subordinate officer ordered Borreno to stop moving.

30.

After Judd's deputies and subordinate officers order the person to stop moving, Judd's deputies and subordinate officers demand the person to show them his/her driver license or identification card. In accordance with this policy, Judd's subordinates told Borreno that he would have to submit to a data criminal warrant/background check.

31.

If the person seeking shelter has his/her driver license or identification card, Judd's deputies and subordinate officers enter the person's information into a computer database and run criminal background check. In accordance

12

with this policy, Judd's subordinates told Borreno that he would have to submit to a data warrant/criminal background check.

32.

If the person seeking shelter does not have a driver license or identification card with them, then Judd's deputies and subordinate officers take the person's fingerprints. Afterward, Judd's deputies and subordinate officers run a background check—which is more extensive than the check run using a driver license/identification card.

33.

The checkpoints are not based on any suspicion of criminal conduct, evidenced by the fact that the officer who told Borreno he is subject to a warrant/criminal background check also never told Borreno that he was suspected of any crime or illegal act at that time.

32.

Criminal suspicion is not raised by trying to enter an emergency shelter to save one's life and the life of family members.

13

about:blank

4/2/2019

C.     **Defendants' claim that they are running warrant checks/criminal background checks to stop sexual predators from entering emergency shelters is a façade.**

33.

Once the story of Judd implementing warrant checkpoints at emergency shelters got out, Judd told the media that his conduct is aimed only toward preventing sexual predators from gaining entry to the shelters.

34.

Judd's statement that the checkpoints—where a person's information was entered into a computer to check for warrants—were aimed only toward preventing sexual predators and sex offenders from gaining entry to the shelters — is a misrepresentation.

35.

The state of Florida requires each person who has been designated a sexual predator or sexual offender who has a driver's license/Identification card to have on that card markings—in big bold letters—that said person is a sexual predator or sexual offender:

> It is unlawful for any person designated as a sexual predator or sexual offender to have in his or her possession a driver license or identification card upon which the sexual predator or sexual offender markings required by s. 322.141 [Color or markings of certain licenses or identification cards] are not displayed or have been altered.

§ 322.212(5)(c), Fla. Stat.

14

36.

Florida law further ensures that the licenses and identification cards of

sexual predators and sexual offenders contain clear markings, by mandating the

following:

> (3) All licenses for the operation of motor vehicles or identification cards
> originally issued or reissued by the department to persons who are
> designated as sexual predators under s. 775.21 or subject to registration as
> sexual offenders under s. 943.0435 or s. 944.607, or who have a similar
> designation or are subject to a similar registration under the laws of
> another jurisdiction, shall have on the front of the license or identification
> card the following:

> (a) For a person designated as a sexual predator under s. 775.21 [The
> Florida Sexual Predator Act] or who has a similar designation under the
> laws of another jurisdiction, the marking **"SEXUAL PREDATOR."**

> (b) For a person subject to registration as a sexual offender under s.
> 943.0435 [Sexual offenders required to register with the department;
> penalty] or s. 944.607 [Notification to Department of Law Enforcement of
> information on sexual offenders], or subject to a similar registration under
> the laws of another jurisdiction, the marking **"943.0435, F.S."**

> (4) Unless previously secured or updated, each sexual offender and sexual
> predator shall report to the department during the month of his or her
> reregistration as required under s. 775.21(8), s. 943.0435(14), or s.
> 944.607(13) in order to obtain an updated or renewed driver license or
> identification card as required by subsection (3).

§ 322.141, Fla. Stat. (bold added).

15

about:blank    4/2/2019

37.

Because of Florida Statutes §§ 322.141 and 322.212, which require convicted sexual predators and sexual offenders with driver licenses or identification cards to have their status as sexual predators or sexual offenders printed on their driver licenses or identification cards, if a person seeking shelter at an emergency shelter has a driver licenses or identification card, Sheriff Judd has no legitimate reason to order his deputies and other subordinate officers to enter that person's information in a computer and run a criminal background check and check for warrants. To determine if a holder of a driver license or identification card is a convicted sexual predator or sexual offender, all deputies and officers need to do is check each person's license or ID card for the marking.

38.

Sheriff Judd's statement that the only purpose of his warrant checkpoints is to separate sexual predators and sexual offenders — whether accused or convicted — is also belied by the fact that he proclaimed to the world, through Twitter and to the traditional media, that his deputies and other subordinate officers would be arresting *anyone* with an outstanding warrant.

39.

Carrie Hortsman, a spokesperson for Sheriff Judd, said that officers at the checkpoints are obligated to take a person into custody if there is a warrant of any kind.

16

### COUNT ONE (FEDERAL CLAIM)
### 42 U.S.C. § 1983 – MONELL CLAIM DUE TO A FOURTH AMENDMENT VIOLATION REGARDING UNLAWFUL SEIZURE (ARREST) OF MR. BORRENO

(Against Defendant Polk County and Sheriff Judd in his official capacity, by Plaintiff Borreno)

40.

Mr. Borreno hereby reiterates and incorporates by reference the allegations contained in paragraphs 1-39 as if set forth fully herein.

41.

At all times relevant to this Complaint, Mr. Borreno had a clearly established right under the Fourth Amendment to the United States Constitution to be free from unreasonable/suspicionless seizures of his by law enforcement officers such as Defendant Judd and his subordinates.

42.

*Based on all facts that have been incorporated to support this Count*, and the facts that Judd was the policy maker – on behalf of Polk County – for all matters related to warrant checks and criminal background checks conducted by Judd and law enforcement officials under his command and control, Defendant Polk County had a policy and practice of establishing pedestrian check points at all emergency shelters during the time period of September 7, 2017, through present, to subject persons to unlawful searches and seizures of person entering said shelter, to include the Plaintiff, Mr. Borerro.

17

2017CA-003170-0000-00      Received in Polk 09/12/2017 03:55 PM

43.

Due to Defendants unlawful conduct, based on the fact incorporated into this count and the allegations within this count, Mr. Borreno is entitled to the equitable relief he seeks.

### COUNT TWO (FEDERAL CLAIM)
### 42 U.S.C. § 1983 – SUPERVISORY LIABILITY CLAIM PURSUANT TO FOURTH AMENDMENT VIOLATION REGARDING DEFENDANTS' UNLAWFUL SEARCH OF MR. BORRENO
(Against Sheriff Judd, in his individual capacity, by Plaintiff Borreno)

44.

Mr. Borreno hereby reiterates and incorporates by reference the allegations contained in paragraphs 1-39 as if set forth fully herein.

45.

At all times relevant to this Complaint, Mr. Borerro had a clearly established right under the Fourth Amendment to the United States Constitution to be free from unreasonable searches of his truck by law enforcement officers such as those officers/deputies under the direct supervision of Judd.

46.

*Based on all facts that have been incorporated to support this Count,* and the fact that Judd, in his individual capacity, was the acting supervisor on law enforcement officers who told Borreno that he must undergo a search and seizure in the form of a warrant/criminal background check prior to entering the

18

subject emergency shelter, Judd authorized, condoned and ratified the unlawful practice of subjecting Borreno to the subject search and seizure.

### 47.

Due to Defendant Judd's unlawful conduct, based on the fact incorporated into this count and the allegations within this count, Mr. Borerro is entitled to the equitable relief he seeks.

## COUNT III (FEDERAL CLAIM)
### 42 U.S.C. § 1983 — REQUEST FOR EQUITABLE RELIEF IN THE FORM OF INJUNTIVE AND DECLARATORY RELIEF
(Against all Defendants by all Plaintiffs)

Plaintiffs hereby reiterates and incorporates by reference the allegations contained in paragraphs 1-39 as if set forth fully herein.

### 48.

*Based on all facts that have been incorporated to support this Count,* Plaintiffs are entitled to declaratory and injunctive relief; this relief serves the public interest and the balance of inequities favor Plaintiffs. Moreover, the irreparable harm that each Plaintiff faces cannot be compensated by money. Furthermore, Plaintiff has no remedy at law.

19

about:blank                                                                              4/2/2019

## ATTORNEY FEES

### 49.

Plaintiff is entitled to reasonable attorney fees under applicable federal and state law.

## PUNITIVE DAMAGES

### 50.

Plaintiffs reserve the right to amend this complaint pursuant to Florida law to seek punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for the following relief:

1. That this Court exercise jurisdiction over this case and grant a jury trial;

2. That this Court decide, as a matter of law, all issues not required to be determined by a jury and declare Defendants' acts unconstitutional;

3. That this Court award all permissible damages recoverable from the Defendant, including general, special, compensatory, punitive, and any other damages deemed appropriate, in an amount to be determined at trial;

4. That this Court permit recovery of reasonable attorney's fees and costs in an amount to be determined by this honorable Court under applicable law; and

5. That this Court grant any additional relief that this Honorable Court deems appropriate under the circumstances.

20

Respectfully submitted this 10th day of September 2017, by:

*Attorneys for Plaintiff:*

**Cynthia Conlin & Associates**
1643 Hillcrest Street
Orlando, FL 32803
Tel. 407-965-5519/Fax 407-545-4397
www.ConlinPA.com

/s/ Cynthia Conlin, Esq.
CYNTHIA CONLIN, ESQ.
Florida Bar No. 47012
Cynthia@conlinpa.com
Secondary Email for Service:
jeff@conlinpa.com

Also, with respect to providing notice about future *pro hac vice* status:

Mario Williams
Nexus Caridades Attorneys Inc.
44 Broad Street, NW, Suite 200
Atlanta, Georgia 30303
(404) 654-0288 Telephone
(404) 592-6225 Facsimile
(Motion for Pro Hac Vice immediately
forthcoming)

/s/MARIO WILLIAMS
GA Bar No. 235254
mwilliams@nexuscaridades.com

21

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LIBRE BY NEXUS,                          )
                                         )
and                                      )
                                         )        Case No. _____
ANDRES BARRENO,                          )
                                         )
        Plaintiffs,                      )
                                         )
v.                                       )
                                         )
SHERIFF GRADY JUDD, in his official      )
capacity as Sheriff of Polk County,      )        JURY TRIAL DEMANDED
Florida, and in his individual capacity, )
                                         )
and                                      )
                                         )
POLK COUNTY SHERIFF'S OFFICE,            )
                                         )
        Defendants.                      )

## COMPLAINT

Plaintiffs, through their undersigned attorney, file this Complaint against

Defendants, SHERIFF GRADY JUDD, in his official capacity as Sheriff of Polk

County, Florida, a/k/a POLK COUNTY SHERIFF'S OFFICE and in his

individual capacity, all of whom have misused emergency shelters as unlawful

pedestrian checkpoints to conduct suspicion-less warrant/criminal background

checks on human beings desperate for shelter to save their lives in the face of the

worst hurricane in modern times. Plaintiffs use 42 U.S.C. § 1983 as the vehicle to

vindicate the constitutional right to be free from unreasonable searches and



1

seizures at an unlawful pedestrian checkpoint. In support of this Complaint,

Plaintiffs allege:

## INTRODUCTION

### 1.

During a crisis situation in which thousands of Florida residents sought

shelter from the worst hurricane in modern times, Sheriff Grady Judd decided to

misuse all emergency shelters in his jurisdiction as pedestrian checkpoints to

detect ordinary criminal wrongdoing. He boasted on Twitter: "If you have a

warrant, turn yourself in to the jail—it's a secure shelter," and, "If you go to a

shelter for Irma and you have a warrant, we'll gladly escort you to a safe and

secure shelter called Polk County Jail." His spokesperson added, "We hope it

[people seeking emergency shelter] actually leads to more people turning

themselves in." Indeed, Judd — the individual who sets policy for Polk County —

has made it quite clear that he and his subordinate officers/deputies are simply

trying to "detect evidence of ordinary criminal wrong doing," at the entrance

doors of shelters being used to save human lives. *See City of Indianapolis v.*

*Edmond*, 531 U.S. 32, 37-48 (2000). All statements to the contrary made by Judd

are belied by the facts, and the law.

2.

Judd's statement that his conduct is aimed toward sexual predators is nothing more than a guise for undertaking unconstitutional searches and seizures. First, the state of Florida requires each person who has been designated a sexual predator/offender who has a driver's license/identification card to have on that card—in big bold letters—that said person is a sexual predator/offender:

> It is unlawful for any person designated as a sexual predator or sexual offender to have in his or her possession a driver license or identification card upon which the sexual predator or sexual offender markings required by s. 322.141 [Color or markings of certain licenses or identification cards] are not displayed or have been altered.

§ 322.212(5)(c), Fla. Stat.

3.

Florida law further ensures that the licenses and identification cards of sexual predators/offenders contain clear markings, by mandating the following:

> (3)    All licenses for the operation of motor vehicles or identification cards originally issued or reissued by the department to persons who are designated as sexual predators under s. 775.21 or subject to registration as sexual offenders under s. 943.0435 or s. 944.607, or who have a similar designation or are subject to a similar registration under the laws of another jurisdiction, shall have on the front of the license or identification card the following:
>
> (a)    For a person designated as a sexual predator under s. 775.21 [The Florida Sexual Predator Act] or who has a similar designation under the laws of another jurisdiction, the marking "SEXUAL PREDATOR."

3

(b)    For a person subject to registration as a sexual offender under s. 943.0435 [Sexual offenders required to register with the department; penalty] or s. 944.607 [Notification to Department of Law Enforcement of information on sexual offenders], or subject to a similar registration under the laws of another jurisdiction, the marking "943.0435, F.S."

(4)    Unless previously secured or updated, each sexual offender and sexual predator shall report to the department during the month of his or her reregistration as required under s. 775.21(8), s. 943.0435(14), or s. 944.607(13) in order to obtain an updated or renewed driver license or identification card as required by subsection (3).

§ 322.141, Fla. Stat.

All the above means that Sheriff Judd does not have to run a warrant check or criminal background check to determine if someone is a sexual predator/offender because all he has to do is check each person's license/ID card and deal accordingly with those persons designated as sexual predators/offenders.

<div align="center">4.</div>

Sheriff Judd's true motives are clear and have been expressed by him explicitly: The purpose of these pedestrian "checkpoints" is to conduct a fishing expedition to find any possible basis, no matter how tenuous, for issuing citations to or arresting human beings seeking refuge from a Category 5 hurricane. The problem is that these searches and seizure are not based on any suspicion of criminal conduct. Suspicion is not raised by trying to gain entry into an emergency shelter to save one's life and the lives of family members.

4

5.

Judd's policy is classic protectionism against "outsiders" entering his

county, and he uses the greatest natural disaster in modern times to execute it.

## PARTIES

6.

At all times relevant to this Complaint, Mr. Barreno was a citizen of the

United States and a resident of Virginia. Mr. Barreno, at all times relevant to this

Complaint, had clearly established legal rights under state and federal law and

the U.S. Constitution. Mr. Barreno submits himself to the jurisdiction and venue

of this Court and is entitled to bring this action under state and federal law for all

general, special, compensatory, punitive, and any other permissible damages.

7.

At all times relevant, Libre by Nexus has been a for profit corporation that

has, as one of its missions, the stabilization of court appearances for immigrants

facing deportation and having active cases before the Executive Office of

Immigration Review (EOIR) courts. Through its secure GPS and

monitoring/support program, Libre by Nexus has increased court appearance by

immigrants in removal proceedings (and released from detention centers) from

an estimated 35% to nearly 99% appearance rate and has secured the release of

over 15,000 immigrants from federal custody so that they can be home with their families, saving US taxpayers in excess of $600,000,000. Libre by Nexus clients receive support and services from the organization.  Libre by Nexus has multiple clients with bonds in the state of Florida, representing millions of dollars in bonds.

<div align="center">8.</div>

At all times relevant to this Complaint, Defendant Judd was a United States citizen, a Florida resident, and the sworn Sheriff of the Polk County Sheriff's Office. At all relevant times to this Complaint, Defendant Judd was acting under the color of state law. At all relevant times, Defendant Judd was subject to the laws of the Florida and the Constitution of the United States. At all relevant times, Judd was responsible for knowing and acting in accordance with all policies, procedures, orders, special orders, general orders, guidelines and regulations of the Polk County Sheriff's Office. And at all relevant times, Judd was the policy maker—on behalf of Polk County Sherriff's Office —for all matters related to warrant checks and criminal background checks conducted by Judd and law enforcement officers under his command and control. Mr. Barreno is using 42 U.S.C § 1983 as the vehicle to sue the Polk County Sherriff's Officer and Defendant Judd in his individual and official capacities regarding federal claims.

## JURISDICTION AND VENUE

### 9.

This Court has jurisdiction over the federal claims in this action in accordance with 28 U.S.C. § 1331 as the claims raise federal questions under the laws and Constitution of the United States.

### 11.

This Court has personal jurisdiction over the individual Defendants because they are domiciled in Polk County, Florida.

### 12.

Venue is proper in the Middle District of Florida, Tampa Division, under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) as the Defendants reside in this District and all, or a substantial part of all, the events giving rise to the claims occurred within this District.

## STATEMENT OF FACTS

A.   The worst Hurricane, natural disaster in modern time

### 13.

In 2017, Hurricane Irma was called one of the strongest storms in recorded history and the strongest ever recorded in the Atlantic Ocean, with a peak intensity of 185 mph, exceeding the likes of Katrina, Andrew and Camille. *See*

7

*Extreme Category 5 Irma crashes into Caribbean, sets sights on Florida and Southeast*

U.S., WASH. POST (Sept. 6, 2017),

https://www.washingtonpost.com/news/capital-

weather-gang/wp/2017/09/06/extreme-category-5-irma-crashes-into-

caribbean-sets- sights-on-Florida-and-southeast-u-s/.

14.

Hurricane Irma maintained maximum wind speeds of at least 185 mph

longer than any other storm in recorded history *on Earth. Id.*

15.

The storm generated the most Accumulated Cyclone Energy, a measure of

both a storm's duration and intensity, of any hurricane on record. Late Tuesday

night, September 5, 2017, the storm's pressure dropped to 914 millibars (the

lower the pressure, the stronger the storm), ranking as the lowest of any storm

on record outside the Caribbean and Gulf of Mexico in the Atlantic basin. Id.

16.

On September 6, 2017, *The Washington Post* reported: "This is a life-

threatening storm that the Hurricane Center warns is capable of catastrophic

damage. Preparations should be rushed to completion along and near its

projected path, including over South Florida." Id.

8

17.

Forecasters warned that Irma's hurricane-force winds were so wide they could reach from coast to coast in Florida, testing the nation's third-largest state.[1]

18.

"This is a storm that will kill you if you don't get out of the way," National Hurricane Center meteorologist Dennis Feltgen said. "Everybody's going to feel this one." Id.

19.

"Irma killed at least 20 people in the Caribbean and left thousands homeless as it devastated small resort islands." Id.

20.

"Irma trained its sights on Florida and officials warned more than 5 million people that time was running out and ordered them to evacuate ahead of the deadly hurricane as it followed a path that could take it from one end of the state to the other." Id.

---

[1] Curt Anderson and Claire Galofaro, *Irma bears down on Florida; more than 5M told to flee coast*, ABC NEWS (Sept., 2017, 11:28 PM), http://abcnews.go.com/US/wireStory/hurricane-warnings-add-urgency-florida- evacuations-49696526.

21.

In one of the largest evacuations in the history of the United States, about 5.6 million people in Florida — more than one-quarter of the state's population were ordered to evacuate and another 540,000 were told to leave the Georgia coast. *Id.*

22.

Authorities opened hundreds of shelters for people who did not leave. Hotels as far away as Atlanta filled up with evacuees. *Id.*

**B.    Defendants implement checkpoint program to detect ordinary, arrestable crimes**

23.

As other counties opened storm shelters and coordinated with privately operated homeless shelters and other facilities to welcome the millions of people seeking refuge from the powerful storm, Polk County Sheriff Grady Judd decided to turn the evacuation into an opportunity trap evacuees who had warrants for any offense and take them to jail, or otherwise deter shelter-seeking evacuees if they had warrants for any offense.

24.

On Tuesday morning, September 6, 2017, from the Polk County Sheriff's official Twitter account, Sheriff Judd tweeted: "If you go to a shelter for #Irma

10

and you have a warrant, we'll gladly escort you to the safe and secure shelter called Polk County Jail" (see below).

25.

A spokesman for Sheriff Judd said, "We hope it [the emergency evacuation] actually leads to more people turning themselves in."

26.

The purpose of these pedestrian "checkpoints" is to conduct a fishing expedition to find any possible basis, no matter how tenuous, for issuing citations to or arresting human beings seeking refuge from a Category 5 hurricane.

27.

Judd ordered his deputies and other officers to go to the emergency shelters for evacuees from Hurricane Irma to set up and enforce the checkpoints.

28.

Pursuant to Judd's orders, at each checkpoint at the entry way of the emergency shelters, when a person seeking entry to a shelter approaches the shelter, Judd's deputies and subordinate officers order the person to stop moving. On September 9, 2017 as Barreno tried to enter the shelter, Judd's subordinate officer ordered Barreno to stop moving.

29.

After Judd's deputies and subordinate officers order the person to stop moving, Judd's deputies and subordinate officers demand the person show them his/her driver license or identification card. In accordance with this policy, Judd's subordinates told Barreno that he would have to submit to a data criminal warrant/background check.

30.

If the person seeking shelter has his/her driver license or identification card, Judd's deputies and subordinate officers enter the person's information into a computer database and run a criminal background check. In accordance with this policy, Judd's subordinates told Barreno that he would have to submit to a data warrant/criminal background check.

31.

If the person seeking shelter does not have a driver license or identification card with them, then Judd's deputies and subordinate officers take the person's fingerprints. Afterward, Judd's deputies and subordinate officers run a background check—which is more extensive than the check run using a driver license/identification card.

32.

The checkpoints are not based on any suspicion of criminal conduct, evidenced by the fact that the officer who told Barreno he is subject to a warrant/criminal background check also never told Barreno that he was suspected of any crime or illegal act at that time.

33.

Criminal suspicion is not raised by trying to enter an emergency shelter to save one's life and the lives of family members.

C.    **Defendants' claim that they are running warrant checks/criminal background checks to stop sexual predators from entering emergency shelters is a façade.**

34.

Once the story of Judd implementing warrant checkpoints at emergency shelters got out, Judd told the media that his conduct is aimed only toward preventing sexual predators from gaining entry to the shelters.

35.

Judd's statement that the checkpoints—where a person's information was entered into a computer to check for warrants—were aimed only toward preventing sexual predators and sex offenders from gaining entry to the shelters — is a misrepresentation.

36.

The state of Florida requires each person who has been designated a sexual

predator or sexual offender who has a driver's license/identification card to have

on that card markings—in big bold letters—that said person is a sexual predator

or sexual offender:

> It is unlawful for any person designated as a sexual predator or sexual
> offender to have in his or her possession a driver license or identification
> card upon which the sexual predator or sexual offender markings required
> by s. 322.141 [Color or markings of certain licenses or identification cards]
> are not displayed or have been altered.

§ 322.212(5)(c), Fla. Stat.

37.

Florida law further ensures that the licenses and identification cards of

sexual predators and sexual offenders contain clear markings, by mandating the

following:

> (3)     All licenses for the operation of motor vehicles or identification
> cards originally issued or reissued by the department to persons who are
> designated as sexual predators under s. 775.21 or subject to registration as
> sexual offenders under s. 943.0435 or s. 944.607, or who have a similar
> designation or are subject to a similar registration under the laws of
> another jurisdiction, shall have on the front of the license or identification
> card the following:
>
> (a)     For a person designated as a sexual predator under s. 775.21 [The
> Florida Sexual Predator Act] or who has a similar designation under the
> laws of another jurisdiction, the marking "SEXUAL PREDATOR".
>
> (b)     For a person subject to registration as a sexual offender under s.
> 943.0435 [Sexual offenders required to register with the department;

14

penalty] or s. 944.607 [Notification to Department of Law Enforcement of information on sexual offenders], or subject to a similar registration under the laws of another jurisdiction, the marking "943.0435, F.S."

(4)     Unless previously secured or updated, each sexual offender and sexual predator shall report to the department during the month of his or her reregistration as required under s. 775.21(8), s. 943.0435(14), or s. 944.607(13) in order to obtain an updated or renewed driver license or identification card as required by subsection (3).

§ 322.141, Fla. Stat. (bold added).

38.

Because of Florida Statutes §§ 322.141 and 322.212, which require

convicted sexual predators and sexual offenders with driver licenses or

identification cards to have their status as sexual predators or sexual offenders

printed on their driver licenses or identification cards, if a person seeking shelter

at an emergency shelter has a driver license or identification card, Sheriff Judd

has no legitimate reason to order his deputies and other subordinate officers to

enter that person's information in a computer and run a criminal background

check and check for warrants. To determine if a holder of a driver license or

identification card is a convicted sexual predator or sexual offender, all deputies

and officers need to do is check each person's license or ID card for the marking.

39.

Sheriff Judd's statement that the only purpose of his warrant checkpoints

is to separate sexual predators and sexual offenders—whether accused or

convicted—is also belied by the fact that he proclaimed to the world, through

15

Twitter and to the traditional media, that his deputies and other subordinate officers would be arresting anyone with an outstanding warrant.

40.

Carrie Hortsman, a spokesperson for Sheriff Judd, said that officers at the checkpoints are obligated to take a person into custody if there is a warrant of any kind.

### COUNT ONE (FEDERAL CLAIM)
### 42 U.S.C. § 1983 – MONELL CLAIM DUE TO A FOURTH AMENDMENT VIOLATION REGARDING UNLAWFUL SEIZURE (ARREST) OF MR. BARRENO

**(Against Defendant Polk County and Sheriff Judd in his official capacity, by Plaintiff Barreno)**

41.

Mr. Barreno hereby reiterates and incorporates by reference the allegations contained in paragraphs 1-39 as if set forth fully herein.

42.

At all times relevant to this Complaint, Mr. Barreno had a clearly established right under the Fourth Amendment to the United States Constitution to be free from unreasonable/suspicion-less seizures of his person by law enforcement officers such as Defendant Judd and his subordinates.

16

43.

*Based on all facts that have been incorporated to support this Count*, and the fact that Sheriff Judd was the policy maker — on behalf of Polk County — for all matters related to warrant checks and criminal background checks conducted by Judd and law enforcement officials under his command and control, Defendant Polk County had a policy and practice of establishing pedestrian check points at all emergency shelters during the time period of September 7, 2017, through present, to subject persons to unlawful searches and seizures of persons entering said shelter, to include the Plaintiff, Mr. Barreno, and Mr. Barreno was, on September 9, 2017, subjected to such an unlawful seizure by the Defendants.

44.

Due to Defendants' unlawful conduct, based on the facts incorporated into this count and the allegations within this count, Mr. Barreno is entitled to the equitable relief he seeks.

### COUNT TWO (FEDERAL CLAIM)
### 42 U.S.C. § 1983 – SUPERVISORY LIABILITY CLAIM PURSUANT TO FOURTH AMENDMENT VIOLATION REGARDING DEFENDANTS' UNLAWFUL SEARCH OF MR. BARRENO

**(Against Sheriff Judd, in his individual capacity, by Plaintiff Barreno)**

45.

Mr. Barreno hereby reiterates and incorporates by reference the allegations contained in paragraphs 1-39 as it set forth fully herein.

46.

At all times relevant to this Complaint, Mr. Barreno had a clearly established right under the Fourth Amendment to the United States Constitution to be free from unreasonable searches or seizures by law enforcement officers such as those officers/deputies under the direct supervision of Judd.

47.

*Based on all facts that have been incorporated to support this Count*, and the fact that Judd, in his individual capacity, was the acting supervisor on law enforcement officers who stopped Barreno at the unlawful pedestrian checkpoint and told him that he must undergo a search and seizure in the form of a warrant/criminal background check prior to entering the subject emergency shelter, Judd authorized, condoned and ratified the unlawful practice of subjecting Barreno to the subject search and seizure.

18

<div align="center">48.</div>

Due to Defendant Judd's unlawful conduct, based on the fact incorporated into this count and the allegations within this count, Mr. Barreno is entitled to the equitable relief he seeks.

<div align="center">

### COUNT III (FEDERAL CLAIM)
### 42 U.S.C. § 1983 — REQUEST FOR EQUITABLE RELIEF IN THE FORM OF INJUNCTIVE AND DECLARATORY RELIEF

**(Against all Defendants by all Plaintiffs)**

</div>

Plaintiffs hereby reiterate and incorporate by reference the allegations contained in paragraphs 1-39 as if set forth fully herein.

<div align="center">49.</div>

*Based on all facts that have been incorporated to support this Count,* Plaintiffs are entitled to declaratory and injunctive relief; this relief serves the public interest and the balance of inequities favor Plaintiffs. Moreover, the irreparable harm that each Plaintiff faces cannot be compensated by money. Furthermore, Plaintiff has no remedy at law.

<div align="center">

**ATTORNEY FEES**

50.

</div>

Plaintiff is entitled to reasonable attorney fees under applicable federal and state law.

<div align="right">19</div>

## PUNITIVE DAMAGES

### 51.

Plaintiffs reserve the right to amend this complaint pursuant to Florida law to seek punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for the following relief:

1.      That this Court exercise jurisdiction over this case and grant a jury trial;

2.      That this Court decide, as a matter of law, all issues not required to be determined by a jury and declare Defendants' acts unconstitutional;

3.      That this Court award all permissible damages recoverable from the Defendant, including general, special, compensatory, punitive, and any other damages deemed appropriate, in an amount to be determined at trial;

4.      That this Court permit recovery of reasonable attorney's fees and costs in an amount to be determined by this honorable Court under applicable law;

5.      That this Court grant injunctive relief against the defendants; and

20

6.      That this Court grant any additional relief that this Honorable Court deems appropriate under the circumstances.

Respectfully submitted this 20th day of April 2018, by:

/s/ Dallas S. LePierre, Esq.
DALLAS S. LEPIERRE, ESQ.
Florida Bar No. 101126
Attorney for Plaintiffs Libre by Nexus and
Andres Barreno
Nexus Derechos Humanos Attorneys, Inc.
44 Broad Street, NW, Suite 200
Atlanta, Georgia 30303
(404) 654-0288 Telephone
(404) 592-6225 Facsimile
dlepierre@ndhlawyers.com
mdobbs@ndhlawyers.com

Also, with respect to providing notice about future pro hac vice status:

Mario Williams
GA Bar No. 235254
Nexus Derechos Humanos Attorneys, Inc.
44 Broad Street, NW, Suite 200
Atlanta, Georgia 30303
(404) 654-0288 Telephone
mwilliams@ndhlawyers.com
(Motion for Pro Hac Vice immediately forthcoming)

/s/MARIO WILLIAMS
GA Bar No. 235254
mwilliams@nexuscaridades.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

LIBRE BY NEXUS, and
ANDRES BARRENO,

     Plaintiffs,

v.                            Case No. 8:18-cv-970-T-35SPF

SHERIFF GRADY JUDD, in his official
Capacity as Sheriff of Polk County,
Florida,

     Defendant.

_____/

### DEFENDANT'S SUPPLEMENTAL RESPONSE
### TO PLAINTIFF'S FIRST REQUEST FOR PRODUCTION

     Defendant, SHERIFF GRADY JUDD, in his official capacity as Sheriff of the

Polk County, by and through the undersigned attorneys, hereby responds to Plaintiff's

First Request for Production as follows:

1.     Please produce all emails regarding the pedestrian checkpoints established at
the entrances into emergency shelters in Polk County, Florida. We propose the
following search terms: "Irma," "Hurricane," "Shelter," "Evacuation," "Evacuees,"
Emergency Shelter," "Barreno," "checkpoint," and "background check."
**Regarding electronic discovery of emails, we have our own IT vendor and
that person must be present when these searches occur and will
coordinate with your designated IT person when conducting the search.
*Please do not cause any electronic searches for emails requested in this
Request for Production to be performed prior to our IT person being
present, and do not cause any electronic searches for emails requested in
this Request for Production to be performed prior to agreeing to search
terms.***

     **RESPONSE:**   Objection.  The request to produce is overbroad in time and
scope, unduly burdensome and seeks documents not reasonably
calculated lead to the discovery of admissible information at trial.  Further,

00684749-1

1



Plaintiff's request to produce imposes an arbitrary requirement that Plaintiff's representatives be present when the documents requested are being gathered; Rule 34 does not impose such a requirement on Defendant's production.

2.   Please produce all social media posts regarding pedestrian checkpoints that forms the basis of this suit. We propose the following search terms: "Irma," "Hurricane," "Shelter," "Evacuation," "Evacuees," Emergency Shelter," "Barreno," "checkpoint," and "background check."

**RESPONSE:**   Objection. The request to produce is overbroad in time and scope, unduly burdensome and seeks documents not reasonably calculated lead to the discovery of admissible information at trial. Without waving the foregoing objections, please see attached.

3.   Please produce all regulations, rules, policies, procedures, special orders and general orders regarding and relating to searches and seizures, emergency shelters, warrant checks, background checks, checkpoints, and natural disasters.

**RESPONSE:**   Objection.   Overbroad, unduly burdensome, irrelevant, immaterial, and not reasonably calculated to lead to the discovery of admissible evidence, given the unlimited time frame.   Without waiving the foregoing objections, please see the attached General Orders and Department of Law Enforcement Directives related to emergency shelters in or about the fall of 2017.

4.   Please produce all documents containing communications related to the posting of Sheriff's Officers at emergency shelters between September 12, 2017 and December 1, 2017.

**RESPONSE:**   The documents have been requested and are being obtained and will be produced upon receipt.

5.   Please produce all documents containing communications related to the requirement to present identification to gain entrance to emergency shelters between September 12, 2017 and December 1, 2017.

**RESPONSE:**   The documents have been requested and are being obtained and will be produced upon receipt.

00684749-1

2

6.  Please produce all documents containing communications related to requirement to submit to background checks and warrant checks to gain entrance into emergency shelters between September 12, 2017 and December 1, 2017.

    **RESPONSE:**      **The documents have been requested and are being obtained and will be produced upon receipt.**

7.  Please produce copies of all documents referenced, identified, or reviewed in preparation of your answers to interrogatories and your Rule 26(a)(1) disclosures, and any supplements thereto.

    **RESPONSE:**   **Other than the documents produced and communications with counsel, none.**

8.  For each social media account maintained by you and the Polk County Sheriff's Office, please provide a full and complete copy of the download data contained in each account and identify the name under which the account is or was registered, as well as the URL of that account. This download should include all data, photographs, writings, things, and other information from the social media account dating from August 1, 2017 through December 1, 2017. Please provide this in an electronic format, either in an emailable file or on flash drive. Please ensure that all photographs and other materials maintain full color.

    **RESPONSE:**      **Objection. Overbroad, not subject to lead to discoverable evidence, irrelevant, immaterial, unwarranted annoyance, harassing, and is oppressive. To comply with the request would be an undue burden and expense on the defendant.**

9.  Please produce any documents or other exhibits which you may introduce as evidence at the trial of this case.

    **RESPONSE:**   **It is unknown at this time what exhibits Defendant will introduce as evidence at trial.**

10. Please produce a copy of the curriculum vitae for every individual you may attempt to elicit any expert testimony from at the time of trial.

    **RESPONSE:**   **Expert witness retention is undetermined at this time.**

11. Please produce any pictures, videos, and audio recording which pertain the allegations in this case.

    **RESPONSE:**      **Objection. Vague, overbroad, not subject to lead to discoverable evidence other than press and public information, copies of**

which have been requested and will be produce upon receipt.   Without waiving the foregoing objections, none.

12.   Produce a privilege log for each privilege asserted in response to this Request.

**RESPONSE:**   None other than categorical privilege assertions, and no privilege log exists.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 18th day of February, 2019, I electronically filed the foregoing with the Clerk of the Court by using the ECF system which will send a notice of electronic filing to: DALLAS S. LEPIERRE, ESQ., (dlepierre@ndhlawyers.com;  mdobbs@ndhlawyers.com), and MARIO WILLIAMS, ESQ., (mwilliams@ndhlawyers.com), Attorneys for Plaintiffs.

s/Hank B. Campbell
HANK B. CAMPBELL
Florida Bar No. 434515
h.campbell@cttalaw.com
r.roop@cttalaw.com
CAMPBELL TROHN
 TAMAYO & ARANDA, P.A.
Post Office Box 2369
Lakeland, Florida  33806-2369
(863) 686-0043
(863) 616-1445 Fax
Attorney for Defendant

00684749-1

4

**2**

**Polk County Sheriff** @Polkcosheriff
We cannot and we will not have innocent children in a shelter with sexual offenders & predators. Period.
twitter.com/polkcosheriff...

783,730 | 44,858 | 5.9%

**Polk County Sheriff** @Polkcosheriff
If you have a warrant, turn yourself in to the jail - it's a secure shelter twitter.com/polkcosheriff...

543,959 | 29,403 | 5.4%

**Polk County Sheriff** @Polkcosheriff
If you go to a shelter for #Irma and you have a warrant, we'll gladly escort you to the safe and secure shelter called the Polk County Jail twitter.com/PolkCoSheriff...

1,845,564 | 293,455 | 15.9%

**Polk County Sheriff** @Polkcosheriff
If you go to a shelter for #Irma, be advised: sworn LEOs will be at every shelter, checking IDs. Sex offenders/predators will not be allowed

762,496 | 125,550 | 16.5%

 **Polk County Sheriff's Office** ✓
September 6, 2017 · 🌐                                                  •••

Shelter FAQs: For any/all questions about evacuations, shelters, pet-friendly shelters, etc.. please visit https://www.polk-county.net/emergency-ma...emergency-shelters.

Please be advised that each and every shelter will have a sworn law enforcement officer at the door of entry - registered sexual offenders and predators will not be allowed access to a shelter, per Florida Statutes.

If you have a warrant, and you show up to a shelter, you will be taken to a very secure shelter, called the Polk County Jail. It will be a safe place during #Irma. should she decide to visit.

Be safe, everyone, and be prepared.

#PCSO #shelterinformation #hurricanepreparedness

POLK-COUNTY.NET
**Emergency Shelters**
It is the policy of Emergency Management to recommend in-place shelter as the primary option during a disaster. For those unable to remain in place. especially those in mobile homes, the remaining choices should be considered in order of preference. Whichever of the following options is

**74,968**
People Reached                        **14,344**
                                      Engagements                        [ Boost Post ]

👍❤️😮 763                                              1.3K Comments  538 Shares

        👍 Like              💬 Comment            ↪ Share        👤 ▼



**Polk County Sheriff's Office**
Published by Carrie Horstman     September 6, 2017  ⊙     •••

"It's very important to assure the community that their emergency shelters will be safe harbors during a storm, because at that point in time our community — the people who have been displaced from their homes — will be staying in a large environment with people they don't know. ... The shelters in Polk County absolutely, unequivocally will be safe." - Grady Judd, Sheriff

As you know, the storm - at this moment in time - doesn't appear that it will hit Polk County. The shelters have not even been opened. People have not been evacuated. This is great news.

Today, we felt the need to inform our citizens about the rules and regulations of shelters in our county. We will not have sexual offenders and predators in a shelter with children.

If you've never been to a shelter before, perhaps you don't realize that logs are kept, for a very good reason - accountability. In a worst case scenario, we need to know who is in a shelter. People sign in, and law enforcement officers are there to keep the peace.

If, during the process of signing someone in, we are made aware of someone who has an active warrant - regardless of the charge - we have a legal obligation to take that person into custody. It is what the law dictates. We don't have a choice. We aren't planning on that eventuality - but it is a possibility, and we wanted everyone to know ahead of time that it is.

In this day and age of social media and instant information, people may not take a few seconds to think before responding. They may panic. They may miss the message. That's understandable. We are here to clear up any misunderstanding.

We want our community to be safe. Period.

Thank you all for your support. We hope #Irma stays away from Florida, and Polk County.

 **Get More Likes, Comments and Shares**
Boost this post for $45 to reach up to 32,000 people.

**87,235**
People Reached

**21,500**
Engagements

[Boost Post]

🔵😍❤ 1.7K                                        524 Comments  359 Shares



**Polk County Sheriff's Office** shared a post
Published by Carrie Horstman · September 7, 2017 ·



**Polk County Government Florida**
September 7, 2017 ·

Polk Shelters will open September 9, 2017

BARTOW, Fla (Sept. 7, 2017) - Based on the current track and estimated time of arrival in Polk County of Hurricane Irma, the following public shelters will be open on Saturday, Sept. 9 at 7 a.m.

• Lake Region High School, 1995 Thunder Road, Eagle Lake
• Tenoroc High School, 4905 Saddle Creek Rd., Lakeland
• Spook Hill Elementary, 321 Dr. J.A. Wiltshire Ave., E  Lake Wales
• Mulberry Middle School, 500 Martin Luther King Ave., Mulberry
• Lake Marion Creek Elem., 3055 Lk  Marion Creek Rd., Poinciana
• Horizons Elementary, 1700 Forest Lake Drive  Davenport
• Chain of Lakes Elementary, 7001 CR 653, Winter Haven
• Davenport School of the Arts, 4751 N CR 547  Davenport
• Donald Bronson Community Center, 124 Bronson Trail, Polk City

"Special Needs" Shelters will also open at 7 a.m. on Saturday, Sept. 9, for those residents with special medical needs. Polk County Emergency Management Special Needs Program is designed to provide shelter and/or transportation for residents with medical or physical conditions and/or dependent on medical electrical equipment who require assistance during an emergency. The "Special Needs" Shelters are located at:
• Polk Co  Health Department, 1255 Brice Blvd , Bartow
• Ridge Community H. S., 500 W. Orchid Dr., Davenport
• McKeel Academy, 1810 W. Parker St , Lakeland

The only "pet friendly" shelter that will be open on Saturday at 7 a.m. will be at Lake Region High School, 1995 Thunder Road  Eagle Lake. Pet owners must bring shot records for their pets, an airline-approved carrying case or crate and pet food.
For the most updated information, please continue to monitor your local news media or call the Citizen's Information Line at 863-401-2234 (locally) or toll-free 866-661-0228. Check the county website for updates at www.polk-county.net. You may also obtain further emergency information at www.facebook.com/polkcountyem and www.twitter.com/polkemergency.

Polk County Public Schools Polk County Sheriff's Office LakelandPD City of Lakeland, FL - Government City of Winter Haven  FL :City Gov't.) City of Lake Wales, Florida Haines City Area Chamber of Commerce City of Auburndale, FL Government City of Fort Meade City of Frostproof  Florida Government City of Mulberry  FL Government The Ledger WFLA News Channel 8 10News WTSP ABC Action News - WFTS - Tampa Bay FOX 13 News - Tampa Bay  Bay News 9

**31,444**
People Reached

**5,694**
Engagements

Boost Unavailable

 **Polk County Sheriff's Office** shared a post
Published by ✏ Michele Cash   · September 9, 2017 · 🌐          • • •

**Please see below to find the OPEN shelters locations in Polk:**

 **Polk County Emergency Management**
September 9, 2017 · 🌐

Some residents are going to shelters that are not open  Our shelter maps are for
reference. Please see below the OPEN shelters locations in Polk:

Public shelters now open are

Auburndale High School.
1 Bloodhound Trail, Auburndale

Bartow High School,
1270 S. Broadway, Bartow

Davenport School of the Arts,
4751 N CR 547, Davenport

Horizons Elementary,
1700 Forest Lake Drive, Davenport

Lake Region High School.
1995 Thunder Road  Eagle Lake

Haines City High School,
2800 Hornet Drive, Haines City

Spook Hill Elementary,
321 Dr. J.A. Wiltshire Ave., E., Lake Wales
George Jenkins High School
6000 Lakeland Highlands, Lakeland

Kathleen High School
1100 Red Devil Way, Hwy 92, Lakeland

Phillip O'Brien Elementary
1255 E. Lime Street, Lakeland

R  Bruce Wagner Elementary
5500 Yates Road, Lakeland

Sleepy Hill Elementary
2285 Sleepy Hill Drive, Lakeland

Tenoroc High School.
4905 Saddle Creek Rd., Lakeland

Mulberry Middle School.
500 Martin Luther King Ave., Mulberry

Lake Marion Creek Middle.
3055 Lk. Marion Creek Rd., Poinciana

Mulberry Middle School.
500 Martin Luther King Ave., Mulberry

Lake Marion Creek Middle.
3055 Lk. Marion Creek Rd., Poinciana

Donald Bronson Community Center.
124 Bronson Trail. Polk City

Chain of Lakes Elementary
7001 CR 653. Winter Haven

Lake Region High School in Eagle Lake and Phillip O'Brien Elementary in Lakeland are pet-friendly facilities.

"Special Needs" Shelters are open for those residents with special medical needs. Polk County Emergency Management Special Needs Program is designed to provide shelter and/or transportation for residents with medical or physical conditions and/or dependent on medical electrical equipment who require assistance during an emergency. The "Special Needs" Shelters are located at:

Polk Co. Health Department.
1255 Brice Blvd., Bartow

Ridge Community High School.
600 W. Orchid Dr., Davenport

McKeel Academy.
1810 W. Parker Street. Lakeland

| 19,758 | 2,070 | Boost Unavailable |
| --- | --- | --- |
| People Reached | Engagements | |

Leslie Loydd. Yvette Castaneda and 63 others          10 Comments

👍 Like          💬 Comment          ↪ Share          ⚫ ▾



**Polk County Sheriff's Office** shared a post.
Published by ✎ Michele Cash    · September 9, 2017 · 🌐



**Polk County Emergency Management**
September 9, 2017 · 🌐

Spook Hill hurricane shelter nearing capacity

Bartow, Fla. (September 9, 2017) — Polk County Emergency Management is reporting that Spook Hill Elementary School in Lake Wales is at nearly 80 percent capacity as a hurricane shelter. Residents in that area of Polk County seek sheltering at Chain of Lakes Elementary School, 7001 CR 653 in Winter Haven instead

For the most updated information, please continue to monitor your local news media or call the Citizen's Information Line at 863-401-2234 (locally) or toll-free 866-661-0228. Check the county website for updates at www.polk-county.net You may also obtain further emergency information at www.facebook.com/polkcountyem and www.twitter.com/polkemergency.

**10,383**
People Reached

**891**
Engagements

Boost Unavailable

🔵 Bolo Hunt, Beatrice Umila-Field and 15 others

3 Comments

👍 Like          💬 Comment          ↪ Share          ⚫ ▾



**Polk County Sheriff's Office** shared a post
Published by ⛔ Michele Cash    · September 9. 2017 · 🌐                    •••



**Polk County Emergency Management**
September 9. 2017 · 🌐

McKeel Academy special needs shelter at capacity

Bartow, Fla. (September 9. 2017) — The McKeel Academy special needs shelter on 1810 West Parker St. in Lakeland has reached capacity. For those who wish to evacuate and require a special needs shelter, there is still room at the Polk County Health Department. 1255 Brice Blvd., Bartow and
Ridge Community High School, 500 W. Orchid Dr., Davenport. Caregivers are welcome.

You will need these items to take to shelter:
• Personal and medical identification
• Daily prescription/non-prescription medicines for (3) days
• Health items: medical equipment. oxygen. eye glasses. hearing aids, prostheses, special dietary foods. etc.
• Two (2) changes of clothing
• Blanket/pillow
• Personal hygiene items: toothbrush. deodorant. soap. disposable underwear. etc.
Call the Citizen's Information Line at (883) 401-2234 or toll-free 1 (866) 661-0228 for more information on shelter locations and requirements. For a complete list of shelter addresses and openings visit https://www.polk-county.net/emergency-ma. . 'emergency-shelters. For the most updated information, please continue to monitor your local news media or check the county website for updates at www.polk-county.net. You may also obtain further emergency information at www.facebook com/polkcountyem and www.twitter com/polkemergency.

POLK-COUNTY.NET
**Emergency Shelters**
It is the policy of Emergency Management to recommend in-place shelter as the primary option during a disaster. For those unable to remain in place, especially those in mobile homes. the remaining choices should be considered in order of preference. Whichever of the

**2,528**
People Reached

**284**
Engagements

**Boost Unavailable**

 **Polk County Sheriff's Office** ✓
Published by Carrie Horstman     September 10. 2017 · 🌐

● ● ●

REMINDER: If you go to a shelter you must bring something on which to sleep (cot, air mattress, sleeping bag, etc) along with bedding (blankets & pillows). Polk County Emergency Management sent out the below list 2 days ago of what to bring - we are copying and pasting it here for your convenience:

(p.s. despite the rumors, fake news, and anything else you may have seen on the Internet, we are NOT concerned with residency status or immigration. and we are NOT turning away anyone who doesn't have an ID. Every shelter has a check-in log, for accountability. If you don't have an ID you will still be allowed to check-in. Our mission is to keep everyone safe!)

BARTOW, Fla. (September 8, 2017) As Hurricane Irma moves closer to Polk County, shelters began their preparations to open. It is important to know what to bring to shelter. Depending on the shelter type the list may vary. See below for a list of recommended items:

Special Needs Shelters
• Photo and medical identification
• Daily prescription/non-prescription medicines for three days
• Health items: medical equipment, oxygen, eye glasses, hearing aids, prostheses, special dietary foods, etc.
• Two changes of clothing
• Blanket/pillow
• Personal hygiene items: toothbrush, deodorant. soap, disposable underwear, etc.
Public Shelters
• Photo identification
• Daily Prescription/non-prescription medicines for three days
• Bedding, blanket, pillow
• Personal hygiene items
• Small cooler with snacks
• Caregivers should accompany their dependents
• No pets; however, registered service animals are allowed
• Documents (Passports, birth certificate. pet documentation, any important documents etc.)

Pet Friendly Shelter

At a pet shelter it is very important that you bring everything you will need and everything your pet will need. Pets must remain kenneled and pet owners must remain with their pet at all times. Plan to bring an additional covering to cover the crate to shield your pet from the business of the shelter.

FOR YOU:

- Photo identification
- Daily prescription/non-prescription medicines for three days
- Bedding, blanket, pillow
- Personal hygiene items
- Small cooler with snacks
- Caregivers should accompany their dependents
- Documents (Passports, birth certificate, pet documentation, any important documents etc.)

FOR YOUR PET:

- Current valid shot/vaccination documentation (including rabies)
- Crate appropriate to size of animal
- Airline crate (Recommended)
- Bowls
- Water
- Pet food
- Leashes, collars, and identification tag
- Medication(s) for pet(s)
- Livestock not permitted

Call the Citizen's Information Line at (863) 401-2234 or toll-free 1 (866) 661-0228 for more information on shelter locations and requirements.

For a complete list of shelter addresses and openings visit https://www.polk-county.net.

For the most updated information, please continue to monitor your local news media or check the county website for updates at www.polk-county.net. You may also obtain further emergency information at www.facebook.com/polkcountyem and www.twitter.com/polkemergency.

**47,903**
People Reached

**7,563**
Engagements

Boost Post

**Polk County Sheriff's Office** ✔
September 9. 2017

Deputy Winberry helping with shelter set-up.



Boost Unavailable

⬤⬤ You. Diane Slaybaugh. Carol Kiersey and 20 others        1 Comment

⬤ Love          💬 Comment          ↝ Share          ⬤ ▾

---

**Polk County Sheriff's Office** ✔
September 9. 2017

Deputies circulated homeless camps yesterday and they are out again today offering rides to the homeless to the open shelters. If you know anyone needing a ride to shelters please call our non-emergency phone number at 863-298-6200. Stay safe. everyone! We are here if you need us!

#HurricaneIrma #Irma #PolkCountyShelters

**65,299**
People Reached

**8,937**
Engagements

Boost Post

⬤⬤👍 1.2K          165 Comments 718 Shares

👍 Like          💬 Comment          ↝ Share          ⬤ ▾